Howard BATEMAN and Marguerite B. Jones, Partners, trading as Ernest Jones Co.

v.

FORD MOTOR COMPANY.

Civ. A. No. 30743.

United States District Court E. D. Pennsylvania.

Jan. 16, 1963.

Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for plaintiff.

Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., for defendant.

JOHN W. LORD, Jr., District Judge.

On April 18, 1962, this Court filed its opinion and order denying plaintiffs' petition for temporary injunction. Bateman v. Ford Motor Co., 204 F.Supp. 357 (E.D.Pa.1962). On plaintiffs' appeal from that ruling, the judgment was reversed and the cause remanded with directions by a divided court. Bateman v. Ford Motor Co., 3rd Cir., 310 F.2d 805.

Prior proceedings are described in the opinion last cited, and in the following reported decisions—all under the caption of Bateman v. Ford Motor Co., 302 F.2d 63 (3rd Cir., rehearing denied April 17, 1962); 204 F.Supp. 357 (E.D.Pa., April 18, 1962); 202 F.Supp. 595 (E.D.Pa., January 23, 1962); 310 F.2d 805 (3rd Cir., December 13, 1962).

Inasmuch as this Court reaffirms its prior findings of fact and conclusions of law, its prior opinion, reported at 204 F.Supp. 357 (April 18, 1962), is incorporated and made part of this opinion as though restated here in its entirety.

The suit is based on an alleged violation of the Dealer's Day in Court Act of August 8, 1956, c. 1038, 70 Stat. 1125, 15 U.S.C.A. §§ 1221–1225. The gist of the remedy is contained in Section 2 of the Act, 15 U.S.C.A. § 1222.

"An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith. Aug. 8, 1956, c. 1038, § 2, 70 Stat. 1125."

The matter has been argued before this Court and the Court of Appeals on a number of occasions, and there have been two hearings in which the plaintiffs presented the testimony of witnesses. The first hearing commenced on April 13, 1962, and was concluded on April 17th, 1962. References herein to the Notes of Testimony (i. e. "N.T.") refer to the transcribed report of that hearing. A further hearing was granted on January 4, 1963, to permit plaintiffs to present further evidence in support of their claim of irreparable injury. The testimony adduced at that hearing has not yet been transcribed.

The findings of fact and conclusions of law which follow are concerned solely with the plaintiffs' petition for temporary injunction. Nothing contained herein is to be taken as an expression of opinion, and much less as a ruling of any sort, on the merits of the plaintiffs' action for damages under the Act. The following findings are based on the testimony taken at the hearings mentioned in the paragraph preceding, and a complete review of the record in this case, including the parties' affidavits and exhibits, the several rulings and decisions heretofore cited, and all briefs and arguments of counsel.

### FINDINGS OF FACT

1. Plaintiffs are Howard Bateman and Marguerite B. Jones, Partners, trading as Ernest Jones Co.

2. Defendant is Ford Motor Company, an automobile manufacturer.

3. Plaintiffs' complaint, filed January 8, 1962, alleged that:

"3. The defendant, from and after November 1958, has failed to act in a fair and equitable manner toward the plaintiff partnership, so as to guarantee the plaintiff partnership freedom from coercion, intimidation, or threats thereof, in: (a) performing and complying with the terms of the franchise contract; and (b) in threatening to terminate the franchise contract."

4. Subsequent to the filing of plaintiffs' complaint, and during the pendency of this action, the defendant has refused to furnish Ford Motor Company products to plaintiffs, and has treated the franchise contract as terminated.

5. Plaintiffs' claim is based on termination by defendant of a sales agreement entered into between defendant and plaintiffs' predecessors on April 1, 1957, which termination is alleged to have been made in bad faith in violation of the Dealer's Act. (Pls. Ex. 1).

6. Defendant's sales agreement, termination of which is the basis of plaintiffs' alleged claim under the Dealer's Act, provides as follows:

Par. 27—"Neither this agreement nor any right hereunder or interest herein may be assigned by the Dealer without the prior written assent of the Company, executed as provided in paragraph E of this agreement."

Par. E—"The Dealer acknowledges notice that (i) this agreement may be executed only in the manner provided therefor in paragraph D hereof, (ii) no one except the Vice President and General Manager or the General Manager or the General Sales Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and they only by an instrument in writing, and (iii) no one except the Vice President and General Manager or the General Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company is authorized to terminate this agreement on behalf of the Company, and they only by an instrument in writing." (Pls. Ex. 1)

7. Paragraph F. of the sales agreement, as supplemented by the last written approval by defendant of any assignment thereof, dated August 9, 1957, such assignment being to a partnership consisting of Howard Bateman and the Estate of Ernest Jones, provides:

"F. This agreement has been entered into by the Company with the Dealer in reliance (1) upon the representation and agreement that the following person(s) substantially participate(s) in the ownership of the Dealer:

HOWARD BATEMAN 6860 Rising Sun Ave. Phila. Pa. 66⅔%

ESTATE OF ERNEST JONES [same address (33⅓%" (Pls. Ex. 1).

8. The Estate of Ernest Jones has no present interest or participation in the ownership of the Dealer and had no such interest at the time defendant gave notice of termination of the dealership on November 3, 1961. (N.T. 13–14).

9. Paragraph 17(a) (1) of the sales agreement provides:

"17(a) Termination. The following provisions shall govern termination of this agreement:

(1) The Company may terminate by notice given to the Dealer not less than ninety (90) days prior to the effective date of such notice in the event the Dealer shall have engaged in any conduct or practice that in the opinion of the Company is detrimental or harmful to the good name, good will or reputation of the Company, Company Products or

other authorized Ford dealers, or is detrimental or harmful to the interests of the Company, other authorized Ford dealers or the public, and the Dealer shall have continued, repeated or failed to cease and desist from such conduct or practice after notice from the Company that continuation or repetition of such conduct or practice will be regarded by the Company as a basis for termination of this agreement pursuant to this subparagraph 17(a) (1)." (Ford Sales Agreement, p. 15; Pls. Ex. 1).

10. Paragraph 17(a) (4) of the sales agreement provides:

"(4) The Dealer may terminate at will at any time by notice given to the Company not less than thirty (30) days prior to the effective date of such notice." (Ford Sales Agreement, p. 16; Pls. Ex. 1).

11. Par. 17(a) (6) of the sales agreement provides:

"(6) If this agreement is not for a stated term specified in paragraph G of this agreement, the Company may terminate at will at any time by notice given to the Dealer not less than one hundred and twenty (120) days prior to the effective date of such notice." (N.T. 77; Ford Sales Agreement, p. 16; Pls. Ex. 1).

12. Plaintiffs' predecessors, who included plaintiff Bateman, were offered a five year dealership term sales agreement, which would have been terminable by defendant only for cause upon ninety (90) days' notice, but plaintiffs' predecessors, including plaintiff Bateman, instead, in or about April, 1957, freely elected to take one terminable on the notice set forth in the foregoing findings numbers 9, 10 and 11 hereof. (N.T. 76, 77).

13. Paragraph 2(a) (1) of the sales agreement provides:

"Sales. The Dealer shall promote vigorously and aggressively the sale of vehicles at retail, and the sale of other company products, in the Dealer's locality, making use to the greatest reasonable extent of the Company's advertising and sales promotions and merchandising material, and shall develop energetically and satisfactorily the potentiality for such sales and obtain a reasonable share thereof; but the Dealer shall not be limited to the Dealer's locality in making sales. Whether or not the Dealer shall have vigorously and aggressively promoted such sales in the Dealer's locality and shall have energetically and satisfactorily developed the potentiality for such sales and obtained a reasonable share thereof, shall be determined by reference to such reasonable criteria as the Company may develop from time to time, including, without limitation, in the case of vehicles (1) the relationship of the Dealer's retail sales of vehicles to users located in the Dealer's locality to (a) the total registrations of vehicles in such locality, (b) the fair and reasonable retail sales objectives of vehicles established for the Dealer for such locality, and (c) the registrations of automobiles (or trucks) of other manufacturers selected by the Company and generally competitive with vehicles in price and product characteristics (hereinafter called 'Competitive Vehicles') in such locality; and (2) comparison of each of the relationships referred to in the foregoing clause (1) with (a) similar relationships with respect to each of not less than three (3) other authorized Ford dealers of reasonably comparable size and located in the nearest areas of sales and service responsibility reasonably comparable to the Dealer's locality, and (b) similar relationships with respect to the average of all authorized Ford dealers as a group in one or more of the following areas: the Company's zone sales area in which the Dealer is located; the Company's district sales area in which the Dealer is located; the Company's regional sales area in

which the Dealer is located; and the national sales area. If the Dealer is not the only authorized Ford dealer in the Dealer's locality, such relationships shall be determined and such comparisons shall be made in the light of the portion of the retail sales of vehicles in the Dealer's locality for which the Dealer fairly may be held responsible.

"In applying any criteria referred to in this subparagraph 2(a), consideration shall be given to the history of the Dealer's Sales performance, the availability of Company Products to the Dealer and special local conditions that might affect the Dealer's sales performance." (N.T. 76–77; Ford Sales Agreement pgs. 1 and 2; Pls. Ex. 1).

14. Except for direct sales to United States government agencies and overseas personnel, defendant depends exclusively on its established dealers, including those in the Philadelphia metropolitan area to sell its cars, and defendant has to rely on the performance of its dealers, so that it will satisfactorily have its cars marketed. The need for proper sales representation by defendant's dealers is a particularly acute situation in the light of the competition defendant faces from Chevrolet. (N.T. 168–169).

15. In 1957, defendant's representatives suggested to plaintiff, Bateman, ways of increasing his sales, including the hiring of four additional salesmen (N.T. 154–155). Plaintiff Bateman testified that he had asked for advice and assistance in connection with certain features of the sales help offered at that time. There was no evidence that he complained to the Ford Motor Company of any coercion in this connection. (N.T. 153–154).

16. Thereafter defendant conducted a market survey of the Philadelphia metropolitan area, and presented its results to all dealers in the area, including plaintiff Bateman, at the end of 1958. (N.T. 92, 93).

17. One of the plaintiffs' asserted grievances is that following that survey their sales objective was increased substantially. Plaintiffs offered no evidence, however, to show that the survey (see finding No. 16 immediately above) was not conducted objectively, or that defendant was not acting in accordance with paragraph 2(a) (i) of the sales agreement (set out in Finding No. 13 of the foregoing).

18. Thereafter, defendant's sales representatives continued to make suggestions to plaintiff Bateman, as they had done before, as to how he could improve his performance. Plaintiffs accepted some of those suggestions, whereas they rejected or chose not to adopt others. (N.T. 154–157).

19. Defendant originally gave notice of termination of the dealership in September, 1959. Under the terms of the sales agreement, plaintiffs were then entitled to present their position to defendant's Dealer Policy Board, which they did. (N.T. 55, 56).

20. As a result, the Board suspended the notice of termination in February, 1960, and in November, 1960, rescinded it entirely, giving weight to plaintiffs' claims of difficulties in obtaining some car models in 1960, although such difficulties were encountered by other dealers. (N.T. 109, 126; Pls. Ex. 3).

21. Plaintiffs were advised by the Board, however, that their performance had still not been satisfactory and would have to improve. (N.T. 129–131; Pls. Ex. 3).

22. Plaintiffs did not challenge the Board's conclusions, but on the contrary replied that they would be happy to cooperate. (N.T. 137–138).

23. Instead of improving, plaintiffs' performance deteriorated so that in 1961 their performance was worse than in 1960 (N.T. 161). Then in September of 1961 a second notice of termination was given, for failure to attain a satisfactory level of sales within the terms of the Sales Agreement and under the provisions of a letter from the Dealer Policy

Board of Ford Motor Company, dated November 3, 1960, which granted plaintiffs a rescission of prior notice of termination subject to future improvement. (N.T. 166; Pls. Ex. 3).

24. Plaintiffs again presented their case to the Dealer Policy Board and this time the Board, after further conferences with plaintiff, Bateman, confirmed the termination on November 3, 1961, effective after 90 days, on February 3, 1962. (N.T. 166; D's Ex. 2).

25. At conferences with the Board, and in other dealings with defendant, plaintiff Bateman was advised by legal counsel. (N.T. 127–128).

26. Paragraph 2(g) of the Sales agreement provides in part:

"In the interests of maintaining harmonious relationships between the parties to this agreement, the Dealer shall report promptly in writing to the Chairman of the Company's Dealer Policy Board, or to such other person as may be designated by the Executive Committee of the Company from time to time, any act or failure to act on the part of the Company or any of its representatives, which the Dealer deems not to have been, or that the Dealer proposes to use in support of a claim that the Company has not acted, in good faith as to the Dealer. For the purposes of this subparagraph 2(g), the term 'good faith' shall mean the Company and its representatives acting in a fair and equitable manner toward the Dealer so as to guarantee the Dealer freedom from coercion, intimidation, or threats of coercion or intimidation, from the Company." (N.T. 81–82; Ford Sales Agreement p. 4; Pls. Ex. 1).

27. Neither the plaintiffs nor the dealer under the sales agreement, prior to defendant's final notice of termination thereof, ever reported in writing to the Chairman of the Company's Dealer Policy Board, or to any other person designated by the Executive Committee of the Company, any act or failure to act on the part of the Company or any of its representatives, which plaintiffs or the dealer deemed not to have been in good faith, or that they proposed to use in support of a claim that the company had not acted in good faith as to the dealer, as defined in paragraph 2(g) of the sales agreement. (N.T. 80).

28. Paragraph 17(b) of the sales agreement provides in part:

"The Dealer acknowledges that each of the duties, obligations and responsibilities of the Dealer under this agreement is reasonable, proper and fundamental to the purposes of this agreement and that failure by the Dealer to fulfill or perform any of the same would constitute a material breach of this agreement * * *" (Pls. Ex. 1)

29. Apart from the sales objectives established by defendant, plaintiffs were unable to meet standards which they themselves established. In 1961 plaintiffs sold only 409 cars (N.T. 158). In that year, plaintiff Bateman had set for his own salesmen a goal of 576 cars. He urged his salesmen to achieve that goal just as defendant urged him to achieve goals which defendant established for him (N.T. 75). At a meeting with defendant's Dealer Policy Board in the fall of 1960, Bateman agreed that a quota of 600 cars for 1961 was reasonable (N.T. 130, 137). Plaintiffs also did not challenge the fairness of their 1957 sales objective of 444 cars, and Bateman admitted that an increased opportunity for sales accrued to him in August, 1958, by virtue of the termination of a dealership in the adjoining Oxford Circle neighborhood (N.T. 167). Plaintiffs' sales objective was increased after August, 1958, and the increase took into consideration the resulting increased opportunity (N.T. 167).

30. With respect to plaintiffs' claim that they were oversupplied or undersupplied with cars, it was testified that such a situation occurred only in 1960, not in 1961, the year of termination. And the dealer was given the benefit of any sales difficulties created by car short-

ages or oversupplies in the action of the Dealer Policy Board on November 3, 1960 rescinding the original termination. (N.T. 126; Pls. Ex. 3).

31. In any event, plaintiffs' complaints about shortages or oversupplies or increased sales objectives concerned difficulties which had also been experienced by another dealer, plaintiffs' own witness, Swenson, who did not claim he was coerced or discriminated against. (N.T. 107–109, 112).

32. In 1961 when plaintiffs' sales performances deteriorated, Swenson increased his sales by 500 cars over 1960, because he put on an aggressive advertising campaign. (N.T. 104, 105; 108, 109).

33. The testimony of plaintiff Bateman at the hearing on April 13, 1962, was not specific as to plaintiffs' advertising expenditures. Such indirect references as were contained in his testimony did not indicate that plaintiffs' advertising was conducted on a large scale. (N.T. 44, 52–65).

At the supplemental hearing on January 4, 1963, he testified that the plaintiffs had expended during the past five years an average of approximately $10,000 per year for advertising the business of the dealership.

By contrast, plaintiffs' own witness, Swenson, testified that his advertising expenditures amounted to about $8,000 per month, or $96,000 per year.

34. Plaintiff Bateman agreed that what defendant's sales representatives did was to make recommendations and suggestions to him. (N.T. 156).

35. One of plaintiffs' apparent grievances was the frequency of visits by one Frank, a sales representative of defendant. Those visits ceased to be frequent after March, 1959, however (N.T. 66). Plaintiffs' witness Swenson testified that Frank visited him about as frequently as plaintiffs (N.T. 107, 108). Moreover, plaintiff Bateman admitted that what Frank did was to make recommendations or suggestions, which he was permitted to do under the Act. (N.T. 156, 157).

Plaintiff Bateman also explained that there was a shortage of cars due to the steel strike (N.T. 67). And after the frequency of Frank's visits stopped in March, 1959, most of plaintiff Bateman's dealings were with defendant's representative, Harris, with whom his relations were pleasant and cordial (N.T. 67, 147).

36. Plaintiff Bateman's testimony as to assets of the dealership, at the hearing on petition for preliminary injunction on April 13, 1962, did not specify an item for good will (N.T. 19). No other evidence on that matter was offered at that time.

At the January 4, 1963 hearing, plaintiff Bateman made assertions as to good will value. He also testified as to the past earnings of the operation, and its repeat business. Without denying that the dealership has good will value, accordingly, this Court is in no position to make a specific finding as to the value, be it more or less, of the good will of the business.

37. Plaintiffs sustained a substantial loss on their car sales for the first nine months of 1961 (N.T. 162).

38. The dealer was offered termination benefits under the sales agreement, whereunder defendant offered to repurchase the dealer's new vehicles, parts, tools, etc., as defined in defendant's offer, in an estimated sum of close to $175,000, which was only a little less than the net worth of the partnership (N.T. 18, 19, 171; Def's Ex. 3).

39. At the further hearing on January 4, 1963, plaintiff Bateman testified that plaintiff dealer has no new Ford automobiles in stock, but is still operating as a going concern. Plaintiffs' requested finding that such are the facts is adopted.

40. On the same testimony, it is also found as a fact that plaintiff dealer has been unable to obtain any new Ford automobiles since April of 1962.

41. Plaintiff Bateman also testified at the January 4, 1963 hearing, and it is found as a fact, that the plaintiffs, as the result of financial losses due to a lack of new Ford automobiles, are faced with

the likelihood of having to go out of business unless able to obtain new Ford automobiles before the end of February, 1963.

## CONCLUSIONS OF LAW

1. Plaintiffs have not shown that defendant failed to act in good faith as defined in the Dealer's Act, in terminating or failing to renew the sales agreement which is the basis of plaintiffs' claim.

2. Plaintiffs have failed to show that defendant engaged in coercion, intimidation, or threats thereof with respect to the termination of the sales agreement which is the basis of plaintiffs' claim.

3. Defendant's conduct with respect to said sales agreement has not amounted to more than recommendation, endorsement, exposition, persuasion, urging or argument in favor of action on the part of plaintiffs or their predecessor and under the Dealer's Act such conduct is privileged and cannot be deemed to constitute a lack of good faith.

4. Defendant did not discriminate against plaintiffs in its dealings with plaintiffs.

5. Plaintiffs have not shown that they will suffer irreparable harm as a result of termination of the dealership, and plaintiffs have an adequate remedy at law.

6. No injury or damages sustained by plaintiffs is attributable to conduct on the defendant's part which violated the Dealer's Act.

7. Defendant was privileged to and did terminate the sales agreement for cause on 90 days' notice, pursuant to its terms.

8. Plaintiffs materially breached the sales agreement by failing to notify the Chairman of defendant's Dealer Policy Board, prior to its termination of the agreement, of any claim that they had been coerced or intimidated.

9. Plaintiffs have not established that they have a clear right to relief, and accordingly a preliminary injunction cannot be issued.

10. Plaintiffs failed to prove bad faith, coercion, discrimination or threatened irreparable harm warranting the issuance of a preliminary injunction under the law.

11. The Court having balanced the equities of the parties, concludes that the plaintiffs are not entitled to the extraordinary remedy of a preliminary mandatory injunction.

12. Under all of the circumstances, plaintiffs' application for a preliminary injunction must be denied.