DAHLBERG BROTHERS, INC. v.
FORD MOTOR COMPANY AND ANOTHER.

137 N. W. (2d) 314.

September 10, 1965—No. 39,638.

*R. J. Leonard, John J. McGirl, Jr.,* and *Doherty, Rumble & Butler,* for appellant.

*Ryan, Kain, Mangan, Westphal & Kressel* and *Francis T. Ryan,* for respondent.

SHERAN, JUSTICE.

The Ford Motor Company appeals from an order of the district court directing the issuance of a temporary injunction pending the determination of an action instituted against it by Dahlberg Brothers, Inc., in which Dahlberg seeks a judgment permanently enjoining the Ford Motor Company from terminating its franchise as a dealer.

The trial court's decision to enjoin temporarily the termination of the dealer's franchise was based upon verified pleadings and affidavits filed by the contending parties. Of necessity, the facts summarized are accepted only tentatively pending determination on the merits.

The Hopkins Motor Car Company was appointed the Ford dealer in Hopkins, Minnesota, in January 1921. In 1929 the name was changed to Dahlberg Brothers, Inc. There were several changes in ownership and organization of the dealership between 1921 and now, but majority ownership has always been in the Dahlberg family. We refer to the corporation as "Dahlberg." In recent years Mr. Earl Dahlberg has been the major owner and the principal executive officer. He owns 88.9 percent of the stock and has been president of the corporation since 1954. Mr. William C. Marsh has owned 11.1 percent of the stock since 1957 and since then has shared with Mr. Dahlberg responsibility for dealership operations.

Dahlberg has operated under a franchise for over 40 years. The agreement was changed from time to time. The one now in effect is dated April 1, 1957. The duration of this agreement, by its terms, is from execution until termination by either party under paragraph 17, which provides for termination by Ford for a number of stated reasons including failure by the dealer to provide satisfactory sales performance. It also provides for termination by either party "at will" upon a stated period of notice.

By letter dated February 11, 1964, Ford sent Dahlberg a notice of

*termination for cause* in accordance with paragraph 17 (a)(1) of the agreement.[1] This notice informed the dealer of its right to appeal the determination to Ford's dealer policy board in which event the running of the notice would be suspended. Dahlberg did appeal and its representatives met with Ford's policy board on March 16, 1964. By letter of April 14, 1964, the board informed Dahlberg of its decision to confirm the notice of termination, explaining in some detail its reasons. By the terms of the board's letter, termination was to be effective 90 days from its receipt, that is, July 14, 1964. On July 1, 1964, Dahlberg instituted the present action and obtained an ex parte temporary restraining order. On July 9, 1964, the trial court conducted a hearing on Dahlberg's motion for a temporary injunction. The motion was granted on July 14, 1964. The order to that effect was entered on July 24, 1964.

The Ford sales agreement grants the dealer the right to purchase new automobiles and Ford trucks and to represent itself as an authorized dealer of Ford in the resale of its products to the public. Ford agrees to fill the dealer's orders in return for the dealer's promise to fulfill certain standards of representation. These standards, set forth principally in paragraph 2 of the sales agreement,[2] are intended by Ford,

---

[1] Paragraph 17(a)(1) of the agreement provides: "The Company may terminate by notice given to the Dealer not less than ninety (90) days prior to the effective date of such notice in the event the Dealer shall have failed to fulfill or perform any one or more of the duties, obligations or responsibilities undertaken by him pursuant to paragraphs 2, 10, 11, 12, 13 and 15, or in the event the Dealer shall have engaged in any conduct or practice that in the opinion of the Company is detrimental or harmful to the good name, good will or reputation of the Company, COMPANY PRODUCTS or other authorized Ford dealers, or is detrimental or harmful to the interests of the Company, other authorized Ford dealers or the public, and the Dealer shall have continued, repeated or failed to cease and desist from such conduct or practice after notice from the Company that continuation or repetition of such conduct or practice will be regarded by the Company as a basis for termination of this agreement pursuant to this subparagraph 17(a)(1)."

[2] Paragraph 2 provides in part: "(a) *Sales and Service Responsibility*.

"(i) *Sales.* The Dealer shall promote vigorously and aggressively the sale of VEHICLES at retail, and the sale of other COMPANY PRODUCTS, in the DEALER's LOCALITY, making use to the greatest reasonable extent of the Company's

we are told, to accomplish two things: First, to assure as much as possible that the dealer will conduct its business in such a way as to reflect favorably upon Ford and its products. Second, to provide Ford with satisfactory competitive representation for its products.

The name "Dahlberg Ford" is well known throughout the Hopkins business area and the firm has established a good business reputation. Plaintiff, with principal place of business at 1023 Excelsior Avenue West, Hopkins, Minnesota, has invested capital there in the amount of $190,000. It employs 65 persons of various skills.

Plaintiff avers:

"That in 1959, * * * plaintiff's average monthly automobile sales were 89 units, its percent of the Metropolitan Market was 8.55% and its profit before taxes was approximately $35,460.00. * * * plaintiff sold an average of 10 new trucks per month. At this time the defendant, Ford Motor Company, * * * had established the desired quota of sales of plaintiff to be 72 new automobile units per month, being 6.65% of the Metropolitan Market and 8 new trucks per month, being 4.94% of the Metropolitan Market.

"That in 1960, and 1961, the quota * * * was unchanged but plain-

---

advertising and sales promotions and merchandising material, and *shall develop energetically and satisfactorily the potentiality for such sales and obtain a reasonable share thereof* [italics supplied]; but the Dealer shall not be limited to the DEALER's LOCALITY in making sales. Whether or not the Dealer shall have vigorously and aggressively promoted such sales in the Dealer's Locality and shall have energetically and satisfactorily developed the potentiality for such sales and obtained a reasonable share thereof, shall be determined by reference to such reasonable criteria as the Company may develop from time to time including, without limitation, in the case of VEHICLES (1) the relationship of the Dealer's retail sales of VEHICLES to users located in the DEALER's LOCALITY to (a) the total registrations of VEHICLES in such locality, (b) the fair and reasonable retail sales objectives of VEHICLES established for the Dealer for such locality, and (c) the registrations of automobiles (or trucks) of other manufacturers selected by the Company and generally competitive with VEHICLES in price and product characteristics (hereinafter called 'Competitive Vehicles') in such locality; and (2) comparison of each of the relationships referred to in the foregoing clause (1) with (a) similar relationships with respect to each of not less than three (3) other authorized Ford

tiff's sales and profit declined as did those of all Hopkins Car Dealers due to the change in the Minnesota Law as herein set forth. That in 1960 plaintiff sold 72 new automobile units per month which was 8.75% of the Metropolitan Market and 8 new trucks per month which was substantially in excess of its market quota assigned it by defendant, but that in said year in doing so plaintiff sustained a loss in the approximate amount of $45,177.00. That in 1961 plaintiff sold 55 new automobile units per month which was 6.98% of the Metropolitan Market and 7 new trucks per month which was approximately the percent of the Market Quota

---

dealers of reasonably comparable size and located in the nearest areas of sales and service responsibility reasonably comparable to the DEALER's LOCALITY, and (b) similar relationships with respect to the average of all authorized Ford dealers as a group in one or more of the following areas: the Company's zone sales area in which the Dealer is located; the Company's district sales area in which the Dealer is located; the Company's regional sales area in which the Dealer is located; and the national sales area. If the Dealer is not the only authorized Ford dealer in the DEALER's LOCALITY, such relationships shall be determined and such comparisons shall be made in the light of the portion of the retail sales of VEHICLES in the DEALER's LOCALITY for which the Dealer fairly may be held responsible.

"In applying any criteria referred to in this subparagraph 2(a), consideration shall be given to the history of the Dealer's sales performance, the availability of COMPANY PRODUCTS to the Dealer and special local conditions that might affect the Dealer's sales performance.

"(ii) *Service.* The Dealer shall render in the DEALER's LOCALITY prompt, workmanlike, courteous and willing service with respect to COMPANY PRODUCTS, including without limitation all service to which a purchaser of a COMPANY PRODUCT from any authorized Ford dealer may be entitled; but the Dealer's obligation in this respect shall not be limited to rendering service only to owners of COMPANY PRODUCTS residing in the DEALER's LOCALITY.

"2. (b) *Place of Business, Facilities and Equipment.* The Dealer shall establish, maintain and equip a place or places of business in the DEALER's LOCALITY, including a salesroom for VEHICLES, facilities for parts and accessories sales, service facilities and a used passenger automobile and truck outlet, of such lay-out, appearance and size as will enable the Dealer adequately to develop in the DEALER's LOCALITY the good will of customers and prospective customers and their acceptance of COMPANY PRODUCTS, and to meet his sales and service responsibilities hereunder; install and maintain therein tools, machinery and equipment recommended by the Company, or of a quality and

assigned it by defendant and that in said year in doing so plaintiff was able to make a small profit in the approximate amount of $4,535.00.

"That in 1962 plaintiff sold 54 new automobile units per month which was 6.2% of the Metropolitan Market and 12 new truck sales per month which was 50% more trucks each month than the sales quota assigned to plaintiff prior to October 1, 1962, and that at this time plaintiff earned a profit in the approximate amount of $42,946.00.

"That in 1963, plaintiff sold 63 new automobile units per month for 6.62% of the Metropolitan Market and 14 new trucks per month for

---

efficiency equivalent thereto, and adequate to meet the normal service requirements of owners of COMPANY PRODUCTS in the DEALER'S LOCALITY to the extent of his sales and service responsibilities hereunder; and maintain the operation of such place or places of business during and for not less than the business hours customary in the trade in the DEALER'S LOCALITY. The Dealer shall not move such place or places of business, once established at a location or locations mutually satisfactory to the Dealer and the Company, to any new or different location, or establish any additional place or places of business for the sale or service of COMPANY PRODUCTS at any other location, without the prior written consent of the Company.

"2. (c) *Capital.* The Dealer at all times shall maintain and employ in connection with the Dealer's business and operations under this agreement such net working capital and net worth as may be required to enable the Dealer properly and fully to carry out and perform all of the Dealer's duties, obligations and responsibilities under this agreement.

\* \* \* \* \*

"2. (e) *Personnel.* The Dealer shall employ and maintain a sufficient number of adequately trained and competent personnel of good character, including, without limitation, department managers, salesmen and mechanics, to carry out and perform properly and fully all of the Dealer's duties, obligations and responsibilities under this agreement; and shall send representative employees of the Dealer to, or cause the attendance of such employees at, such training schools as the Company may conduct from time to time for personnel of its dealers.

\* \* \* \* \*

"2. (k) *Customer Handling.* The Dealer shall make reasonable efforts to handle satisfactorily all matters relating to the sale and servicing of COMPANY PRODUCTS in the DEALER'S LOCALITY, and in pursuance thereof establish regular contact, either by correspondence or personal interview, with owners and users of COMPANY PRODUCTS in such locality; and the Dealer shall report

6.41% of the Metropolitan Market and that in doing so plaintiff was able to earn a profit of approximately $35,474.00.

"That in the month of January, 1964, plaintiff sold 46 new automobile and truck units compared to 40 in January, 1963; and that in February, 1964, plaintiff sold 62 new automobile and truck units compared to 45 new automobile and truck units in February, 1963." [3]

According to Dahlberg, a change occurred in its relationship with Ford beginning in the fall of 1962 in these significant respects:

(1) Between September 30, 1962, and April 1, 1963, a period of 6 months, plaintiff's quota of new cars that it was expected to sell was increased over 43% and its quota of new trucks was increased over 44%.

(2) On December 13, 1962, Ford determined that Dahlberg needed

---

promptly to the Company each complaint received by the Dealer relating to any COMPANY PRODUCT which the Dealer cannot remedy, together with the name and address of the complainant. The Dealer shall make no false or misleading statement or representation to a customer as to what constitute the items of purchase or the prices or charges therefor or the charges made by the Company for distribution and delivery, taxes and other items.

\* \* \* \* \*

"2. (m) *Trade Practices and Advertising*. The Dealer shall conduct his business in a manner that will reflect favorably at all times on the Company and COMPANY PRODUCTS and the good name, good will and reputation thereof; and avoid in every way any deceptive, misleading or unethical practice or advertising that is or might be detrimental to the Company, COMPANY PRODUCTS, other authorized Ford dealers or the public, or to which the Company may object as being detrimental to the good name, good will or reputation of the Company or COMPANY PRODUCTS. The Company shall not publish or employ any misleading or deceptive advertising material or encourage any dealer or group of dealers to do so."

[3] Ford, in rebuttal, has said to Dahlberg: "\* \* \* your actual share of total Ford car sales by all Ford dealers combined in the Minneapolis-St. Paul Multiple Point has been in a downward trend for a considerable period of time, decreasing from 8.75% in 1960 to 6.98% in 1961 to 6.01% in 1962 and to 4.77% in the first three months of 1964, with an increase only in 1963 to 6.76%."

to invest an additional $50,000 in its business. In May of 1963, it determined that the needed investment was an additional $115,000.[4]

(3) In 1963 Ford determined that plaintiff should increase the size of its facility to 140,000 square feet. A proposal by Dahlberg in June of 1963 to expand its location to 65,000 square feet, investing $250,000 to $300,000 to do so was vetoed.[5]

(4) Between October 1, 1962, and February 11, 1964, a Ford representative told personnel inquiring about work for plaintiff that they could do better elsewhere causing them to become employed by other Ford agencies in the area. Ford has been seeking to replace Dahlberg at Hopkins with another dealer.[6]

Plaintiff asserts that a number of factors peculiar to Hopkins, Minnesota, account for whatever business difficulties it may have experienced,[7] including:

(1) The adoption of L. 1957, c. 386, preventing advertising for and making automobile sales on Sunday.

(2) The creation of a Ford franchise at Southdale within 5 miles of plaintiff.

(3) Establishment of a used car lot on September 20, 1963, by another authorized Ford dealer "on the same street as plaintiff in close proximity to and in direct competition with plaintiff."

(4) A peculiarity of the Hopkins automobile market in that "all of the cars of certain leasing companies in the area are registered in Hopkins,

---

[4] Ford's explanation: Dealership's operating investment decreased approximately $30,000. Increase in dealer's market responsibility due to elimination of a metropolitan Ford dealer.

[5] Ford's explanation: Proposal was vetoed because not sufficient to handle volume of business available in Hopkins trade area and also because plans were indefinite and contingent.

[6] Ford denies any acts impeding plaintiff's legitimate interests.

[7] Ford says: "* * * numerous and detailed recommendations were made to plaintiff concerning plaintiff's advertising, personnel, sales practices and dealership management, but that plaintiff did not see fit, or else was unable, to effectuate any significant improvement, either by implementing the recommendations made by affiant, or by devising any other programs."

though actually they are part and parcel of commercial ventures and leasing distributions, and are not straight consumer sales * * *."

Dahlberg contends that the cancellation notice was not effectual to terminate the contract because not based on adequate grounds and because Ford failed to "give the Dealer a reasonable opportunity to cure any failure by the Dealer to fulfill or perform any duty" as required by paragraph 17(c) of the franchise agreement prior to giving notice of termination. Ford's affidavits are to the effect that opportunity was given and rejected.

The decision of the dealer policy board to confirm the notice of termination was based principally upon the fact that the new car sales of Dahlberg had not kept pace with the market "available" to it. It found: Automobile registrations of all makes in the Hopkins, Oak Terrace, and Glen Lake areas in 1963 were 172% of what they had been in 1959. Dahlberg sales in 1963 were only 71% of its sales in 1959. Dahlberg sales as a percentage of all Ford sales in the Twin Cities-Metropolitan area decreased from 8.75% in 1960 to 6.98% in 1961, to 6.01% in 1962, to 6.76% in 1963, to 4.77% for the first three months of 1964.

In the letter from Ford to Dahlberg explaining the reasoning of the dealer policy board, the following appears:

"* * * [T]he principal reason the company elected to send to you a Notice of Termination was that, in its opinion, you had failed, for a considerable period of time, to develop satisfactorily and energetically the market available to you for the sale of new Ford cars in your locality.[8]

\* \* \* \* \*

---

[8] A Ford representative in an affidavit states:

"Prior to October 1, 1962, the annual planning volumes for this dealership, which is part of the Twin Cities Multiple Point, were 862 cars and 98 trucks for a total of 960 units. As the result of a new survey of the Multiple Point, they were increased to 1035 cars and 120 trucks, effective October 1, 1962. Due to the elimination of a major dealer point and a corresponding reduction in the total number of dealers within the Multiple Point, the planning volumes for the dealership were increased, effective April 1, 1963, to 1261 cars and 121 trucks for a total of 1382 units."

Statistical data advanced by Ford includes the following:

"This dealership's car and truck sales performance as a percent of all

"* * * [I]n recent months, your new Ford car sales actually have deteriorated from an already unsatisfactory level.[9]

\* \* \* \* \*

Ford sales in the Twin Cities Multiple Point versus its assigned share of all such sales are tabulated below:

| | Jan-Sept 1961 | | Oct-Dec 1962 | | Jan-Mar 1963 | | Apr-Oct 1963 | |
|---|---|---|---|---|---|---|---|---|
| | C | T | C | T | C | T | C | T |
| "Assg'd % of Mkt Resp. | 6.65 | 4.94 | 6.65 | 4.94 | 7.81 | 5.91 | 7.81 | 5.91 | 9.52 | 7.14 |
| Sls as a % of Total Mkt Sls. | 6.98 | 5.52 | 6.54 | 7.35 | 4.76 | 10.13 | 6.36 | 5.81 | 7.24 | 7.29 |
| Unit Sls. | 664 | 88 | 478 | 100 | 150 | 46 | 151 | 34 | 480 | 102 |

"This dealership's sales compared with competition's registrations are:

| "Sales as a % of Chev. Reg. Based Upon % of Market Resp. | Jan-Sept 1961 | | Oct-Dec 1962 | | Jan-Mar 1963 | | Apr-Sept 1963 | |
|---|---|---|---|---|---|---|---|---|
| | C | T | C | T | C | T | C | T |
| Dahlberg Bros. | 66.1 | 98.9 | 49.0 | 137.0 | 35.0 | 124.3 | 38.1 | 103.0 | 36.3 | 92.5 |
| Twin Cities MP | 63.0 | 88.3 | 49.8 | 91.2 | 57.8 | 73.8 | 46.9 | 106.4 | 48.4 | 96.3 |
| Twin Cities District | 80.3 | 91.6 | 69.4 | 88.5 | 77.5 | 89.6 | 68.8 | 89.3 | 73.1 | 94.9 |

"Comparisons of this dealership's percent of accomplishment against its car and truck objectives and returns on Guide for Dealership Investment with like accomplishments and returns for all Ford dealers in the Multiple Point and District are as follows:

| "Performance Against Objective | Dahlberg Bros. 9 Mo | | | Twin Cities MP 9 Mo | | | Twin Cities Dist. 9 Mo | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1961 | 1962 | 1963 | 1961 | 1962 | 1963 | 1961 | 1962 | 1963 |
| Cars | 83.5 | 62.3 | 49.2 | 83.5 | 68.7 | 58.9 | 89.7 | 81.0 | 77.8 |
| Trucks | 96.7 | 129.2 | 83.3 | 93.8 | 88.0 | 99.0 | 97.4 | 86.3 | 91.1 |
| Return on GDI | 2.0 | 19.5 | 10.2 | 13.7 | 23.2 | 14.1 | 27.0 | 37.0 | 28.2" |

[9] Dahlberg avers: "* * * In the month of June, 1964, Dahlberg Ford sold 102 new cars and 21 new trucks, and * * * ranked either first or second in sales of all Ford dealerships in its area."

"* * * [O]ther make competitive dealers in your immediate area during recent years have made substantial changes in their facilities to bring them more in keeping with the ultimate sales potential of that area. In addition, your new car sales in 1959 totalled 1,066 new cars, while in 1963 they totalled only 755 from facilities which were substantially the same in each of the two years, indicating that you can sell more new cars from your present facilities, although, as you point out, your capital and used car facilities may not have enabled you to do so profitably."

■ The limited issue raised by the appeal is whether the order of the trial court constitutes a clear abuse of discretion. If it does, we should reverse because the judicial power must not be used, even temporarily, to compel the continuance of a business relationship which has proved unsatisfactory to one of the parties unless adequate reasons are established by the party seeking relief. AMF Pinspotters, Inc. v. Harkins Bowling, Inc. 260 Minn. 499, 110 N. W. (2d) 348. At the same time, we must recognize that the facts on which the trial court acts in granting a temporary injunction are, by the nature of the situation, provisional and that the injunctive authority exercised will continue only until a more scientific analysis of the problem is made possible by trial on the merits. Village of Blaine v. Independent School Dist. No. 12, 265 Minn. 9, 121 N. W. (2d) 183.

We evaluate the situation in light of five considerations which we consider relevant in deciding whether the determination made by the trial court should be sustained on appeal: [10]

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.[11]

(2) The harm to be suffered by plaintiff if the temporary restraint

---

[10] For a helpful discussion of the general considerations involved, see *Developments in the Law of Injunctions,* 78 Harv. L. Rev. 994, and particularly pp. 1056 to 1061.

[11] See, Bellows v. Ericson, 233 Minn. 320, 46 N. W. (2d) 654; Chicago, B. & Q. R. Co. v. Chicago Great Western R. Co. (8 Cir.) 190 F. (2d) 361; Northern States Power Co. v. City of St. Paul, 256 Minn. 489, 99 N. W. (2d) 207.

is denied as compared to that inflicted on defendant if the injunction issues pending trial.[12]

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.[13]

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.[14]

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.[15]

---

[12] See, Thermorama, Inc. v. Buckwold, 267 Minn. 551, 125 N. W. (2d) 844; Cramond v. AFL-CIO, 267 Minn. 229, 126 N. W. (2d) 252; Jannetta v. Jannetta, 205 Minn. 266, 285 N. W. 619. "* * * a temporary injunction usually should be granted where the questions presented are grave and injury to the moving party will be certain, substantial, and irreparable if it is denied and the final determination is in his favor, while if it is granted and the decision is unfavorable the inconvenience and loss to the opposing party will be inconsiderable or may be adequately protected by a bond; * * *." 43 C. J. S., Injunctions, § 17. As to the necessity of a bond in Minnesota, see Bellows v. Ericson, *supra.*

[13] See, Williams v. Rolfe, 257 Minn. 237, 101 N. W. (2d) 923. "While the rule has been frequently laid down that a preliminary injunction will not issue where the right which complainant seeks to have protected is in doubt or where the right to the relief asked is doubtful, nevertheless it has often been held proper to maintain the status quo by a temporary injunction even though complainant's right to permanent relief is doubtful." 43 C. J. S., Injunctions, § 19b(2a). See, Tanner Motor Livery, Ltd. v. Avis, Inc. (9 Cir.) 316 F. (2d) 804.

[14] See, State ex rel. Marron v. Compere, 44 N. Mex. 414, 103 P. (2d) 273; Bateman v. Ford Motor Co. (3 Cir.) 302 F. (2d) 63. "Public policy, where the legislature has spoken, is what it has declared that policy to be." Park Const. Co. v. Independent School Dist. 209 Minn. 182, 186, 296 N. W. 475, 477, 135 A. L. R. 59.

[15] See, 49 Am. Jur., Specific Performance, § 86.5; 4 Pomeroy, Equity Jurisprudence (5 ed.) § 1341; e. g., Universal Rim Co. v. General Motors Corp. (E. D. Mich.) 20 F. (2d) 966; Bach v. Friden Calculating Mach. Co. (6 Cir.) 155 F. (2d) 361; Voight Brewery Co. v. Holtz, 168 Mich. 352, 134 N. W. 19; Annotation, 145 A. L. R. 684.

## STATUS QUO ANTE

It is significant that Dahlberg has been the Ford dealer at Hopkins for over 40 years. So far as the record indicates, the relationship was reasonably satisfactory until the fall of 1962. The sale of Dahlberg of Ford products up until that time had approximated the minimum standards of sales performance which had been specified. In reliance upon the continuance of the relationship, Dahlberg had invested almost $200,000 in the business. It is fair to assume that during this period of 40 years considerable time and effort had been expended by Dahlberg to establish a relationship in the public mind between its operation and the Ford products which it sells. It can be assumed also that its sales organization has been geared to the sale of Ford products and convinced that these products are superior to those of its competitors. The skill of its mechanics would be most useful in the repair and maintenance of Ford products. Its experience in the maintenance of an inventory of parts and supplies needed for the business and held by it for sale to the public would be keyed to the needs of Ford owners in its market area. During these four decades, it must have acquired an understanding of the interrelationship between Ford and its dealers, an important though intangible part of the going business. During this period of time both Ford and Dahlberg must have come to know what each might reasonably expect of the other in order to maintain a harmonious relationship.

## RELATIVE HARDSHIPS

Any hardship to Ford resulting from the issuance of the temporary injunction is due to the fact that it is forced to continue a business relationship with a dealer, which, in its judgment, has failed adequately to exploit the market potential in the area where located. If Ford does not have just cause for cancellation of the contract, this is a detriment which must be absorbed—at least until such questions as the adequacy of damages for breach have been fully explored. If it does have just cause for cancellation, the situation is one where a dealer found to be satisfactory for 40 years is given such additional period of life as may be needed to reach a decision on the merits. It is doubtful that the overall success of Ford will be vitally affected during this period of time. Since terminations are rare, the precedent will have a limited impact.

On the other hand, if Ford is not justified in cancelling the contract but is permitted to terminate it anyhow, Dahlberg will be left with an expensive plant designed to meet the needs of a Ford dealer but with no Ford products to sell. Its clerical, sales, and service department personnel will have nothing to do. Dahlberg will either pay unearned wages or lose the trained employees needed to operate a business of this kind. Liaison with the buying public will be interrupted. Those who have become accustomed to buying Ford products from it will be likely to establish a new pattern of buying. Viewed in this light, it seems reasonably clear to us that the balance of hardships weighs heavily in favor of the relief granted by the trial court.

## Merits Prognosis

Plaintiff may have serious obstacles to overcome before establishing its right to what in effect amounts to specific performance of the franchise agreement. The statutory authority for granting a temporary injunction (Minn. St. 585.02) states that a temporary injunction may be granted "[w]hen it appears by the complaint that the plaintiff is entitled to the relief demanded."

In Reichert v. Pure Oil Co. 164 Minn. 252, 204 N. W. 882, it was held that a court of equity will not decree performance of a continuing contract when one of the parties can terminate it at will, but will leave the parties to their remedy at law. That case was decided in 1925.[16] The plaintiff there was a distributor of petroleum products in and near the city of Red Wing. Beginning in 1919, he sold a line of such products under the trade name of "Diamond" gasoline, kerosene, and lubricating oils. Plaintiff had purchased "Energy" gas and "Puritan Motor Oils" from the Pure Oil Company in each of the years of 1921, 1922, and 1923. In November of 1923, the Pure Oil Company refused to sell him any more of these products. Instead it made a contract with a competitor giving him the exclusive rights to sell such products in the city of Red Wing. The action by Reichert was to restrain Pure Oil

---

[16] Peterson v. Johnson Nut Co. 204 Minn. 300, 283 N. W. 561, is helpful in placing the Reichert case in perspective. See, also, Comments, 10 Minn. L. Rev. 169, 20 Minn. L. Rev. 225; Restatement, Contracts, § 372; Annotation: Specific Performance—Mutuality, 22 A. L. R. (2d) 508.

from selling Energy gasoline or Puritan Motor Oils to others and instead to sell to him. The trial court granted the injunction requested after a hearing on the merits and on appeal the judgment was reversed.

Since it appears that the franchise agreement between Dahlberg and Ford was terminable by Dahlberg at will, the Reichert case is in point unless a longstanding franchise agreement with respect to the sale of automobiles and allied products is to be treated differently than the usual contract for the distribution of goods terminable at the will of the distributor.

A further foreseeable barrier to the granting of a permanent injunction in this case comes from the well-established rule that an injunction or decree of specific performance will not lie, if as a result the court will be required to maintain constant supervision over the actions of the parties. Here, as in Bach v. Friden Calculating Mach. Co. (6 Cir.) 155 F. (2d) 361, the franchise contract involves individual and reciprocal rights and duties on the part of the manufacturer on the one hand and the distributor on the other. In the Bach case, the Sixth Circuit Federal Court of Appeals said (155 F. [2d] 366):

"* * * These interwoven obligations remain uncertain in the contract and the necessary result of such decree would be the continued policing of the conduct of the parties, both in respect to the operations of the manufacturer and those of the distributors—a task for which courts are not equipped and which is incapable of compulsion by usual judicial process."

Stronge & Warner Co. v. V. H. Choate & Co. 149 Minn. 30, 182 N. W. 712, is relevant in this connection. There the plaintiff and defendant had entered into a contract whereby plaintiff was to carry on a retail millinery business in defendant's department store. As part of the contract plaintiff agreed to conduct its business with the same degree of refinement and decorum as other departments in defendant's store. Subsequent to the execution of the agreement, plaintiff entered into a similar agreement with a competing department store. Upon learning of that fact, the defendant terminated its contract with plaintiff. Denying an injunction to prevent the termination, we said (149 Minn. 35, 182 N. W. 714):

" * * * It may safely be asserted that neither contemplated that in case of a breach of the contract the court would compel them to continue the relation. Such compulsion, after the parties had come to an open rupture, could hardly fail to be extremely embarrassing and financially detrimental to both. The conditions under which business was to be conducted necessitated friendly co-operation to achieve success. We therefore think the court should not compel specific performance, but give damages if any relief at all was warranted."

But these decisions are not sufficiently in point to justify reversal of the temporary order of the trial court.

Although Reichert v. Pure Oil Co. *supra,* holds that a contract terminable at the will of one party cannot be specifically enforced by him against the other party to it, the business relationship there involved was of relatively short duration; the dependence of the plaintiff upon a continued supply of defendant's products was not made to appear so clearly; and the investment of time and money on the part of plaintiff in a facility peculiarly designed to meet the market requirements of the manufacturer was not so evident as here. The Stronge & Warner case is distinguishable because the plaintiff there sought specific performance of a contract contemplating a relationship where the plaintiff would be operating a department forming a part of the same department store owned and operated by defendant. Ford, headquartered in Dearborn, and Dahlberg, situated at Hopkins, are not so intimately joined.

There are sound reasons for treating the relationship between an automobile dealer and manufacturer as different from that ordinarily existing between the parties to a continuing contract for the sale of goods. These reasons were considered sufficient to support the issuance of a temporary injunction in Bateman v. Ford Motor Co. (3 Cir.) 302 F. (2d) 63, but insufficient to permit the issuance of the permanent injunction after a hearing on the merits.[17] Bateman v. Ford Motor Co. (E. D. Pa.) 214 F. Supp. 222.

---

[17] For a review of the considerations which apply in similar though not identical situations, see 49 Am. Jur., Specific Performance, § 86.5; and see, Annotations: Contract Terminable by One Party Only, 8 A. L. R. (2d) 1208; Specific Performance as a Matter of Right, 65 A. L. R. 7; Injunc-

LEGISLATIVE EXPRESSIONS

There is no statute, State or Federal, which says that an automobile dealer franchise agreement is specifically enforceable in whole or in part. Nevertheless, in considering whether equitable relief is available in a case of this kind, as distinguished from cases involving contract relationships between manufacturers and distributors generally, we can ascertain whether there have been legislative expressions which manifest a public policy on the subject.

In 1955 (L. 1955, c. 626, § 1) a law was enacted in Minnesota which, as amended, now appears as Minn. St. 168.27, subd. 14, and reads as follows:

"It shall be unlawful for any manufacturer or distributor of motor vehicles, or for any officer, employee, agent or representative of such manufacturer or distributor:

"(1) To induce or coerce or attempt to induce or coerce any retail dealer:

\* \* \* \* \*

"(c) To enter into any agreement with such manufacturer or distributor or to do any other act by threatening to cancel any franchise or contractual agreement existing between such manufacturer or distributor and said retail dealer.

\* \* \* \* \*

"(3) To cancel or refuse to renew the franchise of any retail dealer or any contractual arrangement between such manufacturer or distributor and the retail dealer without just cause."

See, Willys Motors v. Northwest Kaiser-Willys (D. Minn.) 142 F. Supp. 469.

The automobile dealers' "Day In Court Act" enacted by Congress on August 8, 1956, provides in part:

"An automobile dealer may bring suit against any automobile manu-

tion—Distributor's Contract, 173 A. L. R. 1198; Injunction Against Employment of Another, 125 A. L. R. 1446; Specific Performance—Exclusive Agency, 145 A. L. R. 684; Sales Agency—Cancelation, 89 A. L. R. 252; Crops—Grower and Processor—Contract, 87 A. L. R. (2d) 732.

facturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." 15 USCA, § 1222.[18]

In Bateman v. Ford Motor Co. (E. D. Pa.) 202 F. Supp. 595, the Federal District Court held that the dealers' "Day In Court Act" does not provide for injunctive relief and therefore plaintiff's application for a temporary injunction to prevent cancellation of his franchise should be denied. On appeal the Circuit Court of Appeals reversed and remanded the case saying that under the general powers of a court of equity the district court has power to enter a preliminary injunction although the Act made no provision for injunctive relief, and the court could enjoin the manufacturer from canceling the franchise. Bateman v. Ford Motor Co. (3 Cir.) 302 F. (2d) 63. However, there are Federal decisions which point the other direction. See, Bethlehem Engineering Export Co. v. Christie (2 Cir.) 105 F. (2d) 933; Bateman v. Ford Motor Co. (E. D. Pa.) 214 F. Supp. 222.

A discussion of these and similar laws will be found in such articles as 41 Minn. L. Rev. 479; Brown and Conwill, *Automobile Manufacturer-*

---

[18] Federal cases discussing this statute include Globe Motors, Inc. v. Studebaker-Packard Corp. (3 Cir.) 328 F. (2d) 645; Kotula v. Ford Motor Co. (8 Cir.) 338 F. (2d) 732; Milos v. Ford Motor Co. (3 Cir.) 317 F. (2d) 712; Leach v. Ford Motor Co. (N. D. Cal.) 189 F. Supp. 349; Ford Motor Co. v. United States, 335 U. S. 303, 69 S. Ct. 93, 93 L. ed. 24; Schnabel v. Volkswagen of America, Inc. (N. D. Iowa) 185 F. Supp. 122; Blenke Brothers Co. v. Ford Motor Co. (N. D. Ind.) 203 F. Supp. 670; Blenke Bros. Motors, Inc. v. Chrysler Corp. (N. D. Ill.) 189 F. Supp. 420; and Garvin v. American Motors Sales Corp. (W. D. Pa.) 202 F. Supp. 667; Id. (3 Cir.) 318 F. (2d) 518.

*Dealer Legislation,* 57 Col. L. Rev. 219; Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract,* 66 Yale L.J. 1135.

We must assume for present purposes that legislative placement of the relationship between automobile manufacturers and dealers in a special category constitutes a reasonable classification.[19] The considerations which make this classification a reasonable one for legislative purposes may, if established in this case during the course of a trial on the merits, be a sufficient reason why the decision in the Reichert case should not control disposition of the claims made by plaintiffs. There is no controlling Minnesota precedent dealing specifically with these problems of equitable relief in the automobile manufacturer-dealer situation. We are not now prepared, and do not intend, to intimate what the views of this court will be if a permanent injunction issues and we are called upon to review it.

### ADMINISTRATIVE PROBLEMS [20]

We have referred to our misgivings as to the possibility of supervising the enforcement of a decree which, in effect, compels supervision of a complicated and continuing contractual relationship. However, the trial court indicated his willingness that this responsibility be assumed temporarily, at least, stating in his memorandum:

"The Court would not have to supervise the details of the contract; it could be continued under its existing terms until litigation has determined the issue of just cause of cancellation. *Lea* v. *Vasco Products,* 81 F. 2d. 1011 (5th Cir. 1936)."

---

[19] See, Rule 24.04, Rules of Civil Procedure.

[20] For a discussion of the theoretical considerations involved, see Grayson—Robinson Stores, Inc. v. Iris Const. Corp. 8 N. Y. (2d) 133, 202 N. Y. S. (2d) 303, 168 N. E. (2d) 377; 5A Corbin, Contracts, § 1171; 5 Williston, Contracts (Rev. ed.) § 1423; Note, 49 Iowa L. Rev. 1290. Corbin approves Fleischer v. James Drug Stores, 1 N. J. 138, 148, 62 A. (2d) 383, 388, where it was said: "Equity may decline jurisdiction where the execution of its decree for specific performance would entail continuing and constant superintendence over a considerable period of time; but this is a rule of policy and convenience of administration, rather than a limitation of jurisdiction, that is not applied unless such relief is found to be impracticable in the particular circumstances."

Presumably, the trial court considered that parties to a franchise arrangement who were able to deal harmoniously for 40 years should be able to do so without court intervention until the merits of this lawsuit have been decided. It may be that this confidence in the objectivity of the litigants is too great. But in view of the long experience that the parties have had with each other without resort to the courts, we accept the judgment of the trial judge in this regard. If Ford, as the party restrained, finds continuance of the relationship unbearable by reason of any misconduct on the part of plaintiff in the performance of its contractual obligations, it can bring the matter to the attention of the trial court by motion to vacate the temporary injunction as presently formulated and by suggesting some form of alternative relief which would meet the requirements of the plaintiff without undue or unnecessary hardship to defendant.[21]

■ It is our conclusion that the determination of the trial court that a temporary injunction should issue was not clearly unreasonable. Therefore, we affirm. See, Berman v. Minneapolis Photo Engraving Co. 144 Minn. 146, 174 N. W. 735; East Lake Drug Co. v. Pharmacists and D. C. Union, 210 Minn. 433, 298 N. W. 722; Hotel & Restaurant Employees' Union v. Tzakis, 227 Minn. 32, 33 N. W. (2d) 859; AMF Pinspotters, Inc. v. Harkins Bowling, Inc. 260 Minn. 499, 110 N. W. (2d) 348.

Affirmed.

[21] See, Tozer v. O'Gorman, 65 Minn. 1, 67 N. W. 666; Northwest Hotel Corp. v. Henderson, 257 Minn. 87, 100 N. W. (2d) 493. See, Jannetta v. Jannetta, 205 Minn. 266, 285 N. W. 619.