**PACIFIC EQUIPMENT & IRRIGATION, INC., Appellant,**

v.

**The TORO COMPANY, Respondent.**

**No. C6–94–109.**

Court of Appeals of Minnesota.

July 26, 1994.

Review Denied (2 Pets.) Sept. 16, 1994.

Robert L. DeMay, Jerry S. Podkopacz, David R. Crosby, Leonard, Street & Deinard, P.A., Minneapolis, for appellant.

Alan I. Silver, James R. Crassweller, Steven G. Mahon, Doherty, Rumble & Butler, P.A., Minneapolis, for respondent.

Considered and decided by KALITOWSKI, P.J., HUSPENI and AMUNDSON, JJ.

## OPINION

HUSPENI, Judge.

Appellant Pacific Equipment & Irrigation, Inc. (Pacific) was a distributor of products for respondent, The Toro Company (Toro). When Toro decided to terminate Pacific's distributorship, Pacific sought injunctive relief to prevent Toro from doing so. Pacific argues that the district court erred in denying its temporary injunction motion. Because we conclude that the district court properly evaluated and balanced the five factors set forth in *Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 137 N.W.2d 314 (1965), we affirm.

## FACTS

Pacific, a closely held corporation, was formed in 1978 for the purpose of acquiring a Toro distributorship in southern California. A distributor agreement was entered into on November 1, 1978. Pacific paid $400,000 for the assets of the Toro Pacific Distributing Company of Los Angeles. Additionally, Pacific paid $100,000 to Toro Sales, over a five-year period, as a "consulting fee." [1]

The original distributor agreement was for a one-year term, with automatic expiration of the agreement at the end of the term. Toro and Pacific entered into fourteen consecutive one-year distributor agreements, terminating on July 31 each year. The agreements were often entered into after the expiration of the previous agreement as, in practice, the parties never treated the distributor agreements as terminated. The last distributor agreement was entered into on November 12, 1992, for the period from August 1, 1992, to July 31, 1993.

The distributor agreement granted to Pacific a non-exclusive right to sell Toro products within an eight-county area, including Los Angeles and the surrounding area. From time to time over the years, Toro notified Pacific of modifications to the distributor agreement. Pacific signed the agreements believing that if it did not, it risked losing the distributorship. The sale of Toro products has accounted for approximately 80% of Pacific's annual sales.

When Toro reviewed its distribution system, it decided that in order to increase its market share and profits, beginning November 1, 1993, it would sell certain of its products directly to general line distributors (GLDs) in California.[2] Toro also concluded that it should transfer territory (Orange and Riverside Counties) from Pacific to another Toro distributor in San Diego. Toro states in making these decisions that it considered at least four factors: (1) the fairest allocation of counties among its distributors; (2) Pacific's inadequate market performance and penetration; (3) negative customer satisfaction reports from Pacific's customers; and (4) Pacific's generally unsatisfactory financial performance, especially its slow payment history and undercapitalization. Toro also states it concluded that its San Diego distributor was more effectively promoting Toro products, had a higher market share, was in a stronger financial position and had higher performance scores than Pacific. Pacific disputes Toro's characterization that it was an ineffective distributor.

When Pacific objected to its loss of territory, Toro offered to transfer only Riverside County to the San Diego distributor. Subsequently, Toro offered to purchase Pacific's business for approximately $2.8 million. Pacific, however, demanded $8 million. Toro states that Pacific's continuing demand of $8 million left Toro with no choice other than to let the distributor agreement expire, and

---

1. Section 4.10 of the distributor agreement provides in part:

   Distributor declares and acknowledges that *this Agreement does not constitute a franchise* as that term is defined under Federal or applicable state law, and acknowledges that its expenses related hereto are knowingly and voluntarily incurred as essential ingredients of its central business objective to remain competi-

   tive by maximizing its opportunity to effectively serve its customers.
   (Emphasis added.)

2. From 1979 to November 1993, Toro sold certain of its products through distributors such as Pacific, who in turn resold these products to GLDs.

Toro announced that as of July 31, 1993, it was "nonrenewing" Pacific's distributorship.

Pacific brought suit seeking injunctive relief to prevent termination of the distributorship, claiming that its relationship with Toro was actually a franchise under both the Minnesota and California franchise acts. Therefore, Pacific alleged, Toro had violated the franchise acts of both states by failing to renew the parties' agreement and that an injunction was necessary to prevent irreparable harm. Pacific also asserted common law claims sounding in contract, promissory estoppel, unjust enrichment, fraud and interference with prospective economic advantage. Toro moved to compel arbitration.

The district court denied Pacific's motion for a temporary injunction and dissolved a temporary restraining order previously issued. By subsequent stipulation, the parties agreed that Toro could begin immediate direct sales to GLDs.

### ISSUES

1. Did the district court abuse its discretion in denying Pacific's motion for a temporary injunction to prevent Toro from terminating its distributorship with Pacific?

2. Should this court grant Pacific's motion to strike certain documents from Toro's appendix? Should this court grant Pacific's motion to supplement the record?

### ANALYSIS

**I. *Temporary Injunction***

**A. Scope and Standard of Review**

■ An appeal from an order denying a motion for a temporary injunction is "strictly limited in scope." *Hvamstad v. City of Rochester,* 276 N.W.2d 632, 632 (Minn.1979). The granting of an injunction

> generally rests within the sound *discretion* of the trial court, and its action will not be disturbed on appeal unless, based upon the whole record, it appears that there has been an *abuse of such discretion.*

*Cherne Indus., Inc. v. Grounds & Assocs., Inc.,* 278 N.W.2d 81, 91 (Minn.1979) (emphasis added).

■ Thus, the sole issue presented by this appeal is whether the district court's denial of Pacific's request for a temporary injunction constitutes a clear abuse of discretion. *See Hvamstad,* 276 N.W.2d at 632. Refusing to grant a temporary injunction rests in the discretion of the district court to such an extent that:

> [A]ppellate courts are not justified in interfering unless the action of the trial court is clearly erroneous and will result in injury which it is the duty of the court to prevent.

*Independent Sch. Dist. No. 35 v. Engelstad,* 274 Minn. 366, 370, 144 N.W.2d 245, 248 (1966).

■ On appeal, the court will view the facts alleged in the pleadings and affidavits as favorably as possible to the party who prevailed below, i.e. Toro in the present case. *Hvamstad,* 276 N.W.2d at 633; *OT Indus., Inc. v. OT-tehdas Oy Santasalo–Sohlberg Ab,* 346 N.W.2d 162, 165 (Minn.App.1984).

**B. Injunctive Relief Factors**

The party seeking the injunction must establish that the legal remedy is not adequate and that the injunction is necessary to prevent great and irreparable injury. *Cherne Indus.,* 278 N.W.2d at 92. The court must evaluate five factors to determine whether a party is entitled to temporary injunctive relief:

> (1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.
>
> (2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.
>
> (3) The likelihood one party or the other will prevail on the merits * * *.
>
> (4) The * * * consideration of public policy expressed in the statutes, State and Federal.
>
> (5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) (footnotes omitted).

The district court in this case examined in detail each of the five *Dahlberg* factors. On review, we must examine the court's findings with regard to each factor to determine whether the district court should be sustained on appeal. *See id.* at 274, 137 N.W.2d at 321. The key factor in our analysis is the likelihood that Pacific will prevail on the merits. The critical inquiry in this case is whether Pacific will prevail on its claim that it is actually a franchisee under the Minnesota Franchise Act. The applicability of the franchise act is important because if the franchise act applies, the analysis of the *Dahlberg* factors may change substantially.

Our analysis of the factors other than that of likelihood of success on the merits will be brief and will assume the franchise act does not apply. Our analysis of the parties' likelihood of success on the merits will focus on Pacific's franchise act claims and how they affect the *Dahlberg* analysis.

### 1. Nature of the Relationship

A temporary injunction is an extraordinary equitable remedy, and its purpose is to preserve the status quo until adjudication of the case on the merits. *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn.1982).

The district court found that the nature and background of the relationship between the parties preexisting the dispute did not favor either party. The court recognized that in the parties' 15–year relationship, Pacific expended considerable capital, time, and effort in establishing Toro products in its territory. The court also recognized, however, that Pacific has voluntarily entered into 14 consecutive distributor agreements and has agreed to many changes. Arguably, the status quo will not continue if the temporary injunction is denied because Pacific may be forced to cease operations. Conversely, however, an argument can be made that the status quo would continue as the distributor agreement would have expired on its own terms. Thus, to treat the distributor agreement as effective would be beyond the terms of the agreement itself. Based on these conflicting views, the district court did not err in determining that this factor does not favor either party.

### 2. Balance of Harms

In balancing the harms, Pacific must show irreparable harm to trigger an injunction, while Toro need only show substantial harm to bar it. *See Yager v. Thompson*, 352 N.W.2d 71, 75 (Minn.App.1984). Although the district court stated that it is "arguable" whether Pacific will suffer irreparable harm if the temporary injunction is denied, the court noted that the availability of money damages negates any presumption of irreparable harm. *See Morse v. City of Waterville*, 458 N.W.2d 728, 729–30 (Minn. App.1990) (to be irreparable, injury must be of such a nature that money alone could not suffice), *pet. for rev. denied* (Minn. Sept. 28, 1990). Additionally, the court noted that Toro could suffer irreparable harm if the temporary injunction is granted. Thus, the district court concluded that the balance of harms factor is not determinative in this case.

In *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734 (8th Cir. 1989), the Eighth Circuit Court of Appeals affirmed the district court's denial of injunctive relief sought by a distributor against the termination of its distributorship. Upon finding that the Minnesota Franchise Act did not apply, the court concluded that the distributor suffered no irreparable injury because it had an adequate remedy at law if it succeeded in establishing the merits on its other claims. *Id.* at 738; *see also Morse*, 458 N.W.2d at 729 (failure to show irreparable harm is, "by itself, a sufficient ground upon which to deny a preliminary injunction"). Similarly, in the present case, if the franchise act does not apply, Pacific will have an adequate remedy at law. Thus, the district court did not err in finding that the balance of harms factor is not determinative in this case.

### 3. Public Policy

The district court did not err in concluding that if the franchise act does not apply, public policy would not favor granting an injunction because this case would involve only a private business dispute. Public poli-

cy would not support requiring parties to remain in a business relationship that is unsatisfactory.

### 4. Administrative Burden

■ The court stated:

Because the parties' relations have substantially deteriorated since the last distributor agreement was entered into, this Court is not assured that the business relationship will continue harmoniously until a trial on the merits. More than likely, this Court will be called upon to resolve disputes between the parties. Also, it will be very difficult for the Court to police the daily business activities taking place in California. Consequently, this Court concludes that a temporary injunction would impose a significant administrative burden on the Court.

We agree that the district court would have been faced with a significant administrative burden if it had granted the temporary injunction. An injunction would require the parties to maintain a cooperative relationship and would impose a continuing duty of supervision on the district court which would be a drain on scarce judicial resources. *See, e.g., Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 277–78 (7th Cir.1992) (court recognized inherent difficulty of supervising a franchise relationship). Thus, the court did not err in finding that the administrative burden on the court favored the denial of injunctive relief.

### 5. Success on the Merits [3]

■ The Minnesota Franchise Act was passed in 1973 as remedial legislation de-

signed to protect franchises within Minnesota from unfair contracts and other previously unregulated abuses in a growing national franchise industry. *Clapp v. Peterson,* 327 N.W.2d 585, 586 (Minn.1982). If Pacific is actually a franchisee, it will likely be able to prove that Toro terminated its distributorship without adequate notice or good cause in violation of Minn.Stat. § 80C.14, subd. 3 and by failing to renew the franchise agreement in violation of Minn.Stat. § 80C.14, subd. 4. The franchise act specifically authorizes the district court to grant injunctive relief to enjoin such violations of the act. Minn.Stat. § 80C.14, subd. 1 (1992).[4] The establishment of a franchise relationship requires the payment of a "franchise fee." Minn.Stat. § 80C.01, subd. 4(a)(3) (1992). The parties dispute whether Pacific paid a franchise fee. A "franchise fee" is defined as

any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee: [listing six exceptions].

Minn.Stat. § 80C.01, subd. 9 (1992).

■ Pacific's central argument, vigorously rejected by Toro, is that the $100,000

---

3. The district court did not err in declining to address Pacific's likelihood of success on the merits of its common law claims. The district court determined that Pacific was not entitled to injunctive relief on these claims because there was no showing that Pacific's legal remedy was inadequate. *See Allstate Sales & Leasing Co. v. Geis,* 412 N.W.2d 30, 32 (Minn.App.1987) (prerequisite for injunctive relief is a "clear showing that any legal remedy * * * is inadequate"). The court properly determined that money damages are adequate because damages are reasonably calculable and provable with reasonable certainty and because Toro has the ability to pay damages.

4. In fact, Pacific may only seek injunctive relief on its franchise act claims. *See* Minn.Stat. § 80C.17, subd. 1 (1992) (damages are available only for violations of "sections 80C.01 to 80C.13 and 80C.16 to 80C.22"). We note that section 80C.17 was amended in 1993. *See* Minn.Stat. § 80C.17 (Supp.1993). Subdivision 1 now provides for money damages for violations of section 80C.14. For franchise agreements with an expiration date, however, the amendment only applies to agreements "entered into or renewed on or after the effective date." Minn.Laws ch. 372, § 8 (1993). Since the last distributor agreement was renewed prior to the effective date, August 1, 1993, the amendment does not apply in this case.

"consulting fee" it paid when it purchased the distributorship was actually a franchise fee, despite the fact that the distributor agreement specifically provides that there is no franchise relationship. The district court concluded that the $100,000

> was paid above and beyond the price paid for the assets of the business and was an additional fee required to be paid by Pacific in order to enter into business with Toro in 1978. Consequently, it is *more likely that Pacific will succeed on the merits that the $100,000 consulting fee can be construed as a franchise fee* paid in 1978.

(Emphasis added.)

Toro, in challenging this conclusion, asks this court to make a de novo determination that the $100,000 was **not** a franchise fee. Toro claims the $100,000 consulting fee was not a franchise fee because (1) the fee was paid to a third party, Toro Sales Co., not the Toro Co.; (2) the fee was paid as part of the price to purchase a going concern at fair market value, not for the right to enter the business; (3) the $100,000 was paid for intangible assets such as customer lists, executory contracts and licenses; and (4) Pacific deducted the consulting fee as a business expenses whereas a franchise fee must be capitalized.[5]

While upon reviewing the record we have some doubt as to the correctness of the district court's conclusion on this issue, it would be improper, in light of our limited standard of review, for this court to accept Toro's invitation. On appeal, this court should not adjudicate the issues raised in the complaint. *See Thompson v. Barnes*, 294 Minn. 528, 536, 200 N.W.2d 921, 927 (1972).

The critical issue that we must decide is whether the district court was compelled to issue a temporary injunction after determining that Pacific was likely to prevail on the merits of its franchise act claim. If the franchise act applies, irreparable harm is "presumed," *see* Minn.Stat. § 80C.14, subd. 1, and, therefore, the irreparable harm factor would favor Pacific. Similarly, if the franchise act applies, the consideration of public policy would favor Pacific, since Pacific would be entitled to special protection under the law as a franchisee. *See, e.g., Westfield Centre Serv. Inc. v. Cities Serv. Oil Co.*, 86 N.J. 453, 432 A.2d 48, 57 (1981) (court stated the purpose of their state's franchise act was to correct "the unequal bargaining power of the parties leading to unconscionable termination provisions that imperiled innocent franchisees with substantial losses"). Accordingly, if the franchise act applies, it is likely that a district court, in analyzing the *Dahlberg* factors, would be compelled to find that the moving party is entitled to temporary injunctive relief.

In *Wadena Implement Co. v. Deere & Co.*, 480 N.W.2d 383 (Minn.App.1992), *pet. for rev. denied* (Minn. Mar. 26, 1992), this court recognized the compelling nature of a statutory provision for injunctive relief. In *Wadena*, an agricultural equipment dealer had been terminated by a manufacturer and sought injunctive relief under the Minnesota Agricultural Equipment Dealership Act (MAEDA), Minn.Stat. §§ 325E.045–.0684 (1990). In affirming the district court's grant of injunctive relief, this court stated:

> [W]here injunctive relief is explicitly authorized by statute, * * * proper exercise of discretion requires the issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purposes behind the statute's enactment.

*Id.* at 389.

The facts of the present case, however, are distinguishable from those in *Wadena*. In

---

5. *Toro also argues that even if the consulting fee could be construed as a franchise fee, Pacific's claim is barred by the franchise act's statute of limitations which bars commencement of an action "more than three years after the franchisee pays the first franchise fee." Minn.Stat. § 80C.17, subd. 5 (1992). Pacific's claims, however, are pursuant to section 80C.14, which is not within the purview of section 80C.17. Thus, the district court correctly determined that Pacific's claims are not barred by the statute of limitations.*

We previously noted that section 80C.17 was amended in 1993. Subdivision 1 now brings section 80C.14 within the purview of the statute of limitations and subdivision 5 provides that no action may be commenced "more than three years after the cause of action accrues." Minn. Stat. § 80C.17, subd. 5 (Supp.1993). As discussed *supra*, however, the amendment does not apply in this case.

*Wadena,* the parties did not dispute that their relationship was controlled by MAEDA. In the present case, the parties legitimately dispute whether their relationship is governed by the Minnesota Franchise Act. Thus, the entitlement to injunctive relief is not automatic here.

We hold that where the parties legitimately dispute whether a product distributor is actually a franchisee under the Minnesota Franchise Act, the district court is not required to grant a temporary injunction where the court merely finds that the party claiming the existence of a franchise agreement is more likely than not to prevail on the merits of that claim. If there is a close factual dispute which could go either way at a trial on the merits, a court should be reluctant to issue a preliminary injunction. *Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. 1121, 1124–25 (D.R.I.1982), *aff'd,* 715 F.2d 10 (1st Cir.1983). Thus, the district court here did not err by concluding:

> [T]his likelihood of success will not alone give rise to the need for injunctive relief in this case. All five *Dahlberg* factors must be considered as a whole.

### C. Balancing of Factors

■ The district court in this case properly balanced the five *Dahlberg* factors and concluded:

> None of the factors weigh heavily in favor of Pacific. Although Pacific has reached its burden in regard to some of the factors, this case is not clear and free from doubt that a temporary injunction is necessary to prevent a great and irreparable injury.

The district court was in the best position to analyze the facts and to balance the *Dahlberg* factors. Our standard of review is narrow, and we find no abuse of the district court's discretion in denying Pacific's request for injunctive relief.[6]

## II. *Motions*

### A. Letter

■ The composition of the record on appeal is "[t]he papers filed in the trial court,

the exhibits, and the transcript of the proceedings, if any." Minn.R.Civ.App.P. 110.01. Pacific objects to the inclusion in Toro's appendix of a letter purporting to terminate the parties' franchise agreement if, in fact, one exists. This letter was not part of the record before the district court. Generally, an appellate court may not base its decision on matters outside the record on appeal and may not consider matters not produced and received in evidence below. *Thiele v. Stich,* 425 N.W.2d 580, 582–83 (Minn.1988). We grant Pacific's motion to strike the letter and any references thereto in Toro's brief.

### B. Cobb Affidavit

■ Pacific claims that a portion of an affidavit by one of Toro's expert witnesses reveals confidential information in violation of the parties' agreement not to reveal certain settlement negotiations. We need not, however, address the merits of Pacific's motion. The affidavit challenged here was before the district court and therefore is part of the record. *See* Minn.R.Civ.App.P. 110.01. Thus, any motion to strike should have been brought in the district court. Further, we have placed no reliance on the challenged affidavit in reaching our decision in this matter.

### C. Documents

Pacific and Toro entered into a confidentiality stipulation and order, limiting the use of documents designated as "confidential." Pacific asserts that Toro's appendix includes six confidential documents that contain "sensitive financial information" including audited financial records, growth/business plans and a stock purchase agreement. Because we construe the confidentiality order to be still in effect and conclude that Toro has mischaracterized the order to support its position, we grant Pacific's motion to strike the six documents. Further, because no purpose would be served by making these confidential documents part of the public record, we direct the appellate clerk's office to physically remove

---

6. Had the parties agreed that Pacific was a franchisee, an analysis and balancing of the *Dahlberg* factors in light of the applicability of the Minnesota Franchise Act probably would have required a conclusion that Pacific had met its burden for injunctive relief.

the referenced documents from the court record.

### D. Motion to Supplement Record

Pacific asks to supplement the record by submitting the cover sheet to its Partners in Excellence Report (PIE) in order to clarify assertions made by Toro concerning Pacific's alleged performance deficiencies. We find no basis to support supplementing the record. This report was not before the district court, and we deny Pacific's motion.

### DECISION

The district court did not abuse its discretion in denying Pacific's motion for a temporary injunction. We grant Pacific's motions to strike the letter and to remove six documents from Toro's appendix, and deny Pacific's motions to strike a portion of the affidavit and to supplement the record with the PIE report.

**Affirmed.**

AMUNDSON, J., concurs specially.

AMUNDSON, Judge (concurring specially).

The absence of a clear finding by the district court that the Minnesota Franchise Act governs the relationship between the parties permits me to concur in the result reached by the majority. I write, however, to emphasize the importance of franchise law when analyzing motions for injunctive relief.

To understand franchising, reference must be made to social and economic changes in history. In much earlier days, certain people such as tax collectors were empowered to perform functions within the domain of the sovereign. In return for their performance, these nascent "franchisees" kept a percentage of what was collected. This practice grew into a system of subdividing grants of power and is the progenitor to the present franchise system.

The modern franchise system was greatly assisted in its development by the legislative grant of franchise rights to utilities. Rapid growth in the United States expanded the use of the franchise system in many areas as a means of providing goods and services. Early on, the franchise system benefited most manufacturers, which often had insufficient capital for regional or national distribution. Franchising became one of the main methods by which business could accomplish expansion.

Following World War II, there was a massive growth in franchising. This economic phenomenon has continued through to the present. The unfettered growth in franchising has brought about many abuses in the system. Thus, regulatory supervision has been attempted at both the state and federal levels. As the majority opinion notes, Chapter 80C of the Minnesota Statutes was adopted in 1973 as remedial legislation designed to protect franchises within Minnesota from unfair contracts and other prevalent and unregulated abuses. *See Clapp v. Peterson,* 327 N.W.2d 585, 586 (Minn.1982).

Additionally, our state legislature has passed other laws regulating certain business relationships designed to protect businesses from abusive tactics by manufacturers or suppliers. *See, e.g.,* the Minnesota Motor Vehicle Sale and Distribution Act, Minn.Stat. §§ 80E.01–.18 (1992); the Minnesota Beer Brewers and Wholesalers Act, Minn.Stat. §§ 325B.01–.17 (1992); the Minnesota Agricultural Equipment Dealerships Act, Minn. Stat. §§ 325E.05–.067 (1992).

In a manufacturer/distributor relationship, such as in the present case, the relationship between the parties often lacks parity. The manufacturer usually has far greater bargaining power and can often dictate terms. When the distribution agreement comes up for renewal, the distributor often cannot risk confrontation with the manufacturer.

The manufacturer can usually get some other party to distribute its products. The distributor, who has often spent years building up the business, has everything to lose. Although the manufacturer may not be acting in bad faith in asserting its interests, its superior bargaining position leaves the distributor with a Hobson's choice of acquiescence or loss of its investment.

The Minnesota Franchise Act is an attempt to protect the franchisee from undue

**920**

usurpation of the franchise relationship and to establish balance of bargaining power. Should the franchise act be construed to permit termination or nonrenewal whenever it is to the franchisor's economic advantage, the act would be empty. Thus, I believe the Minnesota Franchise Act should be broadly construed to prevent the unfair results described above.

If the parties had agreed that Pacific was a franchisee, or had the district court definitively found that Pacific was a franchisee, then I believe the district court would have been compelled to grant a preliminary injunction enjoining Toro from terminating its distributorship with Pacific.

Pacific sought relief for alleged violations under Minn.Stat. § 80C.14, subds. 3, 4 (1992) of the Minnesota Franchise Act. Under Minn.Stat. § 80C.17, subds. 1, 4 (1992), Pacific cannot seek a claim for money damages for violations of section 80C.14.[1] Thus Pacific's sole remedy under the franchise act would be injunctive relief.[2] Because injunctive relief would be the only remedy available, Pacific's remedy would be largely meaningless if preliminary relief were denied. *See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 858 F.2d 1339, 1340 (8th Cir.1988), *vacated*, 871 F.2d 734 (8th Cir.1989) (decision was vacated upon finding that the Minnesota Franchise Act did not apply, not upon the merits of the franchise law analysis). Additionally, if the franchise act applied, irreparable harm would be "presumed." *See* Minn. Stat. § 80C.14, subd. 1 (1992).

Even in the absence of a presumption of irreparable harm, it is likely that Pacific will in fact be irreparably harmed if a temporary injunction is not granted. Here, Pacific derived approximately 80% of its sales from Toro products. The loss of such a large portion of its sales will almost certainly put Pacific out of business. Common sense dictates that such an injury is irreparable. *See Carlos v. Philips Bus. Sys., Inc.*, 556 F.Supp. 769, 774 (E.D.N.Y.1983) (where 90% of distributor's business is comprised of sale of manufacturer's products, distributor substantiated claim that manufacturer's conduct threatened to cause irreparable harm), *aff'd*, 742 F.2d 1432 (2d Cir.1983).

The majority opinion states that any injury to Pacific cannot be said to be irreparable because Pacific has an adequate remedy at law. Although Pacific would certainly be entitled to money damages under its common law claims, can damages be truly adequate in a case such as this? *See Al Bishop Agency, Inc. v. Lithonia–Division of Nat'l Serv. Indus., Inc.*, 474 F.Supp. 828, 835 (E.D.Wis. 1979) ("reduction of business perhaps can be compensated by money, but the destruction of a business * * * cannot be compensated with money"). The franchise act was enacted because of the inadequacy of these alternatives in the unique circumstances of a franchise relationship. *See* Note, *Regulation of Franchising*, 59 Minn.L.Rev. 1027, 1028–36 (1975). Thus, if it were clear that Pacific was a franchisee, the purpose of the franchise act could only be fulfilled by the granting of injunctive relief.

Appellate courts rarely reverse the denial of injunctive relief. *See, e.g., Independent Sch. Dist. No. 35 v. Engelstad*, 274 Minn. 366, 370–71, 144 N.W.2d 245, 248 (1966). Although I believe this is a close case for reversal, in the absence of an explicit finding that Pacific was a franchisee, I must concur with the majority opinion's analysis that the district court did not abuse its discretion in denying Pacific's request for a temporary injunction. *See Colt Indus., Inc. v. Fidelco Pump & Compressor Corp.*, 700 F.Supp. 1330, 1332 (D.N.J.1987) (distributor not entitled to injunction under the New Jersey Franchise Act where it failed to prove it was a franchisee), *aff'd*, 844 F.2d 117 (3d Cir. 1988).

---

1. Minn.Stat. § 80C.17, subd. 1 was amended in 1993 to provide that a person who violates any provision of "this chapter" shall be liable for damages. *See* 1993 Minn.Laws ch. 372, § 1. As the majority opinion notes, however, the amendment is inapplicable to this case.

2. Pacific would still have an action for monetary damages for claims outside the franchise act. *See* Minn.Stat. § 80C.17, subd. 4 (nothing in the franchise act limits liability which may exist by virtue of other statutes or under common law).