**UNLIMITED HORIZON MARKETING, INC., Appellant,**

v.

**PRECISION HUB, INC., et al., Respondents,**

**Steven Bendzick, et al., Defendants.**

**No. C7–94–2483.**

Court of Appeals of Minnesota.

June 13, 1995.

Daniel T. Kadlec, Alan L. Kildow, Larkin, Hoffman, Daly & Lindgren, Bloomington, for appellant.

William R. Skolnick, Mark V. Steffenson, William R. Skolnick, P.A., Minneapolis, for respondents.

Considered and decided by PARKER, P.J., TOUSSAINT, C.J., and HARTEN, J.

## OPINION

PARKER, Judge.

Appellant Unlimited Horizon Marketing, Inc. (UHM), contracted with respondent Ervin Bendzick and his manufacturing business, respondent Precision Hub, to become the exclusive distributor of a recycling machine invented by Bendzick. Bendzick attempted to terminate the agreement, and UHM sought injunctive relief to enforce the agreement and to prevent respondents from directly marketing and selling the machine.

The trial court denied UHM's motion for a temporary injunction and dissolved a temporary restraining order previously issued. The court concluded that the Minnesota Franchise Act did not govern the distributor agreement and that UHM did not establish irreparable harm. UHM appeals from the court's order and judgment denying the temporary injunction. We reverse, vacate the order and judgment, and remand for further proceedings.

## FACTS

Respondent Ervin Bendzick invented a recycling machine called the "Metal Chip Pelletizer." Bendzick owns the businesses engaged in the manufacture of the pelletizer

machines, respondent Precision Hub and MCP/Metal Chip Pelletizer. Thomas Baker is the president of appellant UHM, a corporation formed in April 1993 for the sole purpose of marketing and selling the machine.

Baker testified that UHM was formed as a result of discussions with Paul Falk, a former vice president of Precision Hub who represented that he was president of that company. Baker and Falk executed an agreement in April 1993 whereby UHM would obtain exclusive rights worldwide to market and sell the machines. Baker issued Falk a check for $15,000 payable to Precision Hub. He testified that he issued this check pursuant to the agreement as consideration for exclusive marketing rights. Falk delivered the check to Bendzick.

Bendzick accepted and cashed the $15,000 check. He testified that he was unaware of the agreement executed by Falk and Baker, yet he accepted the money and deposited it in his bank. Bendzick testified that Falk "brought the check and he said they were going to market the machine and this was up-front money to market it." Approximately one month later, Bendzick contacted Baker and informed him that Falk was not employed by Precision Hub and was not authorized to bind Precision Hub by contract. Bendzick indicated that he did not intend to honor the initial agreement, but would negotiate a new agreement.

The parties executed a new agreement in July 1993 which is a revised version of the initial agreement. Baker testified that UHM already had undertaken marketing efforts and incurred significant expenses in locating purchasers for the pelletizer machines. Bendzick testified that UHM promised as part of the revised agreement to purchase four machines within approximately one week. Baker disputes this. He claims to have told Bendzick only that UHM had solicited a potential customer that soon might purchase four machines.

Approximately one month after the parties executed the revised agreement, Bendzick sent UHM a letter purporting to terminate the agreement due to "the fact that [Precision Hub] never received an order for four units." Bendzick wrote that Precision Hub would begin selling the machines directly to customers on August 7 if UHM did not place a purchase order for four machines prior to that date. UHM placed its first purchase order in January 1994. Precision Hub filled the order, and the parties continued to engage in business relations. Representatives from UHM testified that in September 1994, Precision Hub began to market and sell machines directly to customers previously solicited by UHM.

UHM filed a complaint against Bendzick and Precision Hub. The complaint alleges breach of contract, tortious interference with contract, fraud and misrepresentation, unfair competition, and violation of the Minnesota Franchise Act. UHM also requested injunctive relief. The trial court denied UHM's motion for a temporary injunction upon concluding that the Minnesota Franchise Act was inapplicable and that UHM had not shown irreparable harm.

## ISSUE

Did the trial court abuse discretion in denying UHM's motion for a temporary injunction to enforce the exclusive distributorship agreement?

## DISCUSSION

### I. Temporary Injunction

■ An appeal from an order denying a motion for a temporary injunction is limited in scope. *Pacific Equip. & Irrigation v. Toro Co.*, 519 N.W.2d 911, 914 (Minn.App. 1994), *pet. for rev. denied* (Minn. Sept. 16, 1994). Facts are viewed in a light most favorable to the prevailing party, and the decision to deny injunctive relief will not be disturbed absent a clear abuse of discretion. *Id.* at 914–15.

■ There are five factors to be considered when determining whether to issue a temporary injunction: (1) the nature and background of the parties' relationship prior to the dispute; (2) the harm plaintiff may suffer if the injunction is denied compared to the harm inflicted upon defendant if the injunction is granted; (3) the likelihood one party will prevail on the merits; (4) public

policy as expressed in the statutes; and (5) the administrative burdens involved in judicial supervision of the injunction. *Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965).

■ The party seeking an injunction must establish that the legal remedy is inadequate and the injunction is necessary to prevent irreparable harm. *Pacific Equip.,* 519 N.W.2d at 914. The trial court concluded that UHM did not establish that it would suffer irreparable harm if the temporary injunction were denied, and that Bendzick/Precision Hub would suffer significant harm if the injunction were granted. *See Yager v. Thompson,* 352 N.W.2d 71, 75 (Minn.App. 1984). As a general rule, "the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." *Morse v. City of Waterville,* 458 N.W.2d 728, 729 (Minn.App.1990) (citations omitted), *pet. for rev. denied* (Minn. Sept. 28, 1990).

Because the court concluded that UHM did not establish irreparable harm, it did not address the remaining *Dahlberg* factors. The court also concluded that UHM did not prove that the parties' distributorship agreement was a franchise agreement governed by the Minnesota Franchise Act. *See* Minn. Stat. §§ 80C.01–.30 (1994). If the agreement is governed by the Franchise Act, irreparable harm to the franchisee may be presumed, *id.; Pacific Equip.,* 519 N.W.2d at 917, and the trial court is authorized to enjoin specified violations of the Act. *See* Minn.Stat. § 80C.14, subd. 1.

## II. Applicability of the Minnesota Franchise Act

■ The agreement between UHM and Bendzick/Precision Hub is a "franchise" agreement if it is a contract

(1) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

(2) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

(3) for which the franchisee pays, directly or indirectly, a franchise fee.

Minn.Stat. § 80C.01, subd. 4(a).

The agreement between UHM and Bendzick/Precision Hub provides UHM with "the right to utilize all of the manufacturer's trade names in marketing manufacturer's product." This provision meets the requirement of section 80C.01, subdivision 4(a)(1). *See Martin Investors v. Vander Bie,* 269 N.W.2d 868, 874 (Minn.1978) ("[t]he statute requires only that the franchisee be granted the right to use the franchiser's name"). The requirement of subdivision 4(a)(2) also is satisfied, since the parties will each profit from a common source upon the marketing and sale of the pelletizer machines. *See id.*

■ The parties dispute whether UHM paid Bendzick/Precision Hub a franchise fee. The term "franchise fee" is broadly defined. *Martin Investors,* 269 N.W.2d at 875 (Minn. 1978). It includes

any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee: [listing six exceptions].

Minn.Stat. § 80C.01, subd. 9.

Baker paid Bendzick/Precision Hub $15,-000 when the parties executed the initial distributor agreement. Baker testified that he paid this money pursuant to the agreement as consideration for the exclusive right to market the machine. Bendzick accepted the $15,000 check, cashed it, and deposited the money into his business account. He did not return the money after the parties executed the revised distributor agreement.

During testimony, Bendzick was questioned, "why did you think that you were getting paid the $15,000?" He answered, "Paul [Falk] * * * said they were going to market the machine and this was up-front money to market it." There is no evidence from which to reach a contrary finding. No facts elicited even suggest that the $15,000 payment falls within any of the six statutory exceptions to the definition of "franchise fee." *See id.*, subd. 9(a)–(f).

Based on these facts, we hold that the $15,000 payment is, as a matter of law, a franchise fee. Since the three statutory prerequisites have been established, the agreement between UHM and Bendzick/Precision Hub is a franchise agreement governed by the Minnesota Franchise Act. Because the Franchise Act applies, "the analysis of the *Dahlberg* factors may change substantially." *Pacific Equip.*, 519 N.W.2d at 915.

Irreparable harm to the franchisee will be presumed if there is a violation by a person who is required to register under section 80C.02 but who fails to do so. Minn. Stat. § 80C.14. Bendzick is required as a franchisor to file a registration statement. *See id.* § 80C.02. There is no evidence or claim that he complied with this requirement.

The evidence thus far adduced indicates that UHM is likely to be able to demonstrate that Bendzick/Precision Hub further violated the Act. Although Bendzick testified that UHM agreed to the immediate purchase of four machines, there is no documentary evidence to support this bald assertion. The franchise agreement contains no requirement that UHM immediately purchase four machines. Bendzick/Precision Hub therefore may have violated the Act by terminating the agreement without "good cause." *See id.* § 80C.14, subd. 3. There may be additional violations involving the lack of compliance with notice and cure provisions required for termination of a franchise. *See id.*

Applicability of the Franchise Act will increase UHM's likelihood of success on the merits because of the presumption of irreparable harm. *See Pacific Equip.*, 519 N.W.2d at 917. In addition, public policy considerations will favor UHM, since it is entitled to special protections under the law as a fran-

chisee. *See id.* The trial court did not address whether Bendzick/Precision Hub violated the Franchise Act and did not issue findings as to each factor recognized in *Dahlberg Bros.* as determinative of the need for a temporary injunction. Trial courts are required to make findings of fact and conclusions of law when refusing an interlocutory injunction. Minn.R.Civ.P. 52.01.

## DECISION

We reverse and vacate the trial court's order and judgment denying UHM's motion for a temporary injunction, and remand for the court to determine whether Bendzick/Precision Hub violated the Minnesota Franchise Act. The presumption of irreparable harm will favor UHM, and the court will be required to issue explicit findings as to the remaining factors pronounced in *Dahlberg Bros. See Dahlberg Bros.*, 272 Minn. at 274–75, 137 N.W.2d at 321–22. As with all presumptions of fact, the presumption of irreparable harm may cease to operate if Bendzick/Precision Hub presents evidence sufficient to support a contrary finding. *See Firkus v. Murphy*, 311 Minn. 85, 87, 246 N.W.2d 864, 866 (1976). The court may reopen the record for consideration of further evidence in this matter, if necessary.

**Reversed and remanded.**