*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0010**

Dexon Computer, Inc.,
Respondent,

vs.

Modern Enterprise Solutions, Inc.,
Appellant,

Timothy Durant, et al.,
Defendants.

**Filed August 1, 2016
Affirmed
Jesson, Judge**

Hennepin County District Court
File No. 27-CV-15-17171

Scott M. Flaherty, Michael C. Wilhelm, Michael M. Lafeber, Briggs and Morgan, P.A., Minneapolis, Minnesota (for respondent)

Christopher J. Harristhal, Daniel J. Ballintine, Andrew David Moran, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota (for appellant)

John A. Fabian, Nicholas G. B. May, Fabian May & Anderson PLLP, Minneapolis, Minnesota (for defendants Timothy Durant and Andrew Uzpen)

Considered and decided by Jesson, Presiding Judge; Halbrooks, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**JESSON**, Judge

Appellant Modern Enterprise Solutions Inc. (MES) claims that the district court abused its discretion by granting a temporary restraining order. MES argues that the district court's order was based on improper evidence. MES also maintains that respondent Dexon Computer Inc. is unlikely to prevail on its underlying claims and has failed to show that without a restraining order it will suffer irreparable harm. We affirm.

## FACTS

Dexon buys and sells computer equipment. In early 2015 and for several years prior, defendants Andrew Uzpen and Timothy Durant worked as sales representatives at Dexon. In March of 2015, Uzpen ended his employment with Dexon and took a job with its competitor, MES. In August of 2015, Durant also left Dexon for a position with MES. At the time they left, Dexon was concerned that Uzpen and Durant took Dexon customer-leads list information, described further below, with them to MES.

Dexon maintains a list of customer leads that includes company names, contact information, and hardware brand preferences for actual and potential Dexon customers. Dexon purchases some of this information from Data.com, a service to which MES also subscribes. But Dexon also develops the leads list through the research and networking of its employees. Dexon's full customer-leads list includes tens of thousands of contacts. Only a few individuals within Dexon have access to this master list. Most employees have access only to a portion of the leads list and use it to solicit sales.

The leads list is stored on the Dexon computer network, which can be accessed through computers in Dexon's offices. Although Uzpen and Durant dispute the extent to which these policies were enforced, Dexon maintains that it requires employees to have usernames and passwords to access Dexon computers and that employees must use keys to access its offices.

Dexon instructs employees to back-up their customer-leads list on personal flash drives and take them home. Dexon has no written confidentiality policies related to the customer-leads list and does not require employees to sign a noncompete agreement.

When Uzpen went to MES, he kept his flash drive containing the portion of the Dexon leads list to which he had access. He considered downloading this information to MES's customer-leads database, but did not because it was not compatible.

When Durant left Dexon for MES, he also had a copy of the customer-leads list on a flash drive. Just days after leaving Dexon, Durant sent a mass email informing customers that he was moving to MES and offering to underbid open Dexon orders and quotes. Durant admits that the email was sent to contacts on the portion of the Dexon customer-leads list that he had access to. A subsequent analysis of his flash drive revealed that it contained contact information for 10,056 customers and was organized by hardware preference.

After Durant left, Dexon's CEO, Stephen O'Neil, received a phone call from an anonymous MES employee on August 31, 2015. The employee told O'Neil that Durant had stolen 11,000 customer leads from Dexon and taken them to MES. The employee said that MES had encouraged the theft and was using the leads to steal Dexon's

3

customers. The employee also told O'Neil that Uzpen brought customer leads from Dexon to MES.

O'Neil later received a letter from the anonymous MES employee. The letter included copies of MES purchase orders for sales completed by Durant in the first several weeks after he left Dexon. Some of the purchase orders show that Durant made sales at MES to customers he had solicited while at Dexon.

Shortly thereafter, in September of 2015, O'Neil received a call from a former MES employee. The former employee also told O'Neil that he had heard from people inside MES that Durant had stolen Dexon's customer leads and brought them to MES.

In October 2015, Dexon filed a verified complaint against MES, Uzpen, and Durant. Dexon seeks damages for misappropriation of trade secrets and several other claims. Dexon also moved for a temporary restraining order, requesting that defendants be enjoined from "continued misappropriation of trade secrets" and other tortious activity involving use of the customer-leads list.

In December 2015, the district court issued an order granting Dexon's request for a temporary restraining order. The order prohibits MES, Uzpen, and Durant from using or disclosing any "Confidential Dexon Information," which is defined as "any and all information derived from Dexon's list of customer leads; except for that information included on the Dexon list that was already known by Defendant MES prior to obtaining the Dexon list; or was . . . obtained by MES from the Data.com subscription." The order also requires MES, Uzpen, and Durant to return the information derived from the flash

drives to Dexon and to delete any "Confidential Dexon Information" from the MES computer system or other electronic devices in their possession. This appeal follows.

## D E C I S I O N

A temporary restraining order is an extraordinary equitable remedy used to preserve the status quo pending adjudication of the merits of a case. *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn. 1982). The decision to grant a temporary restraining order may be reversed only for a clear abuse of discretion. *Carl Bolander & Sons Co. v. City of Minneapolis*, 502 N.W.2d 203, 209 (Minn. 1993). The district court's factual findings will not be set aside unless clearly erroneous. *LaValle v. Kulkay*, 277 N.W.2d 400, 402 (Minn. 1979). We view the facts alleged in the pleadings and affidavits in the light most favorable to the party prevailing in the district court. *Pacific Equip. & Irr., Inc. v. Toro Co.*, 519 N.W.2d 911, 914 (Minn. App. 1994), *review denied* (Minn. Sept. 16, 1994).

A district court may grant a temporary restraining order if the party seeking the order establishes that monetary damages are not adequate and that denial of the order will result in irreparable harm. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 92 (Minn. 1979). In evaluating whether the district court abused its discretion by granting a temporary restraining order, we consider five factors: (1) the nature and background of the relationship between the parties; (2) the balance of harms suffered by the parties; (3) the likelihood that the party seeking the injunction will prevail on the merits; (4) public-policy considerations as expressed in statute; and (5) the administrative burdens involved in judicial supervision and enforcement of the injunction. *Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 274-75, 137 N.W.2d 314, 321-22 (1965).

MES argues that, in granting the temporary restraining order, the district court erred by relying on Dexon's verified complaint, including the statements of the anonymous and former MES employees. MES further argues that the district court abused its discretion by determining that Dexon is likely to succeed against MES on its trade secret and other claims and asserts that Dexon failed to show that it would suffer irreparable harm in the absence of an injunction. We first address MES's evidentiary arguments and then discuss Dexon's likelihood of success, irreparable harm, and the remaining *Dahlberg* factors.

## A. MES's evidentiary claims

MES argues that Dexon's complaint "was not properly verified and could not support injunctive relief as a matter of law." MES claims that a verified complaint must be based only on personal knowledge and that it is unclear what allegations in Dexon's complaint are based on "reliable information" and what allegations are based on personal knowledge. MES further argues that the statements of the anonymous and former MES employees are hearsay and were improperly considered. We disagree.

A temporary restraining order may be granted based solely on a complaint if the complaint makes out a sufficient case, is verified, and contains positive allegations. Minn. R. Civ. P. 65.01; *Indep. Sch. Dist. No. 35 v. Engelstad*, 274 Minn. 366, 369, 144 N.W.2d 245, 248 (1966). "[E]vidence is 'positive' where the witness states that a certain thing did or did not happen or exist." *Miller v. Hughes*, 259 Minn. 53, 59, 105 N.W.2d 693, 698 (1960).

MES cites a number of cases stating that injunctive relief cannot be issued on facts stated on information and belief alone. *See e.g.*, *Armstrong v. Sanford*, 7 Minn. 49, 52, 7 Gil. 34, 40 (1862). But MES's verified complaint is not based only on information and belief. The verification states that the complaint is based on O'Neil's "personal knowledge and reliable information." Many of the allegations in the complaint are positive and are within O'Neil's personal knowledge as the CEO of Dexon. For example, O'Neil would have personal knowledge of when Uzpen and Durant were employed at Dexon; of Uzpen and Durant's job duties and access to the customer-leads list while at Dexon; and of how Dexon develops, stores, and uses customer-lead information. O'Neil also personally received the mass email Durant sent to Dexon customers shortly after leaving for MES.

Furthermore, as the district court noted, many of the allegations in the complaint are supported not just by the complaint but also by the affidavits of Uzpen and Durant. Both Uzpen and Durant admitted that they left Dexon for MES and that they took flash drives with them containing Dexon's customer-leads list. Durant admits that he sent out the mass email using Dexon's customer-leads list. Durant also admits that he solicited business from customers while at MES that he had previously worked with at Dexon. In addition, sales Durant made to Dexon customers shortly after leaving Dexon are catalogued in the purchase orders attached to the complaint.

MES's arguments that the district court erred by relying on the statements of the anonymous MES employee and the former MES employee are also unavailing. Even if this information is hearsay, given the haste with which preliminary-injunction decisions

must be made, the United States Supreme Court has said that an injunction is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834 (1981). Many federal courts of appeal have therefore permitted hearsay to provide the basis for preliminary injunctive relief. *See, e.g.*, *Mullins v. City of New York*, 626 F.3d 47, 51-52 (2d Cir. 2010) (listing decisions from other circuits that allow preliminary injunctive relief to be based on hearsay and adopting that position). We find this reasoning persuasive.

MES points to an unpublished decision of this court stating that a district court may not grant a preliminary injunction based on hearsay. *Kelley v. Rudd*, No. C7-91-1142, 1992 WL 3651 (Minn. App. Jan. 14, 1992), *review denied* (Minn. Mar. 26, 1992). But unpublished decisions are not precedential. Minn. Stat. § 480A.08, subd. 3 (2014). And *Kelley* denied injunctive relief because the appellant's affidavit was "based entirely on hearsay evidence." 1992 WL 3651, at *4. In contrast, the district court here granted the injunction based not only on the statements of the anonymous and former MES employees but also on the facts in the complaint that were within O'Neil's personal knowledge, on the admissions of Uzpen and Durant, and on other documentary evidence.

### B. Likelihood that Dexon will succeed on its claims against MES

We begin our analysis of the *Dahlberg* factors by discussing Dexon's likelihood of succeeding on the merits of its claims. "If a plaintiff can show no likelihood of prevailing on the merits, the district court errs as a matter of law in granting a temporary

8

injunction." *Metro. Sports Facilities Comm'n v. Minn. Twins P'ship*, 638 N.W.2d 214, 226 (Minn. App. 2002), *review denied* (Minn. Feb. 4, 2002).

### 1. *Misappropriation of trade secrets*

To prevail on a claim under the Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-.08 (2014), the plaintiff must show both the existence and misappropriation of a trade secret. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983). The act defines a trade secret as information that (1) is not generally known or readily ascertainable; (2) derives independent economic value from secrecy; and (3) is the subject of efforts that are reasonable under the circumstances to maintain secrecy. Minn. Stat. § 325C.01, subd. 5(i), (ii); *Electro-Craft Corp.*, 332 N.W.2d at 899-901. If an employee acquires a trade secret without express notice that it is a trade secret, then the employee must know or have reason to know that the owner expects secrecy. Minn. Stat. § 325C.01, subd. 5.

MES argues that the customer-leads information is not a trade secret because this information was either already possessed by MES or readily ascertainable. MES also argues that Dexon failed to undertake reasonable efforts to keep its customer-leads list confidential. The district court's findings on whether information is generally known or readily ascertainable and on whether information is the subject of efforts that are reasonable under the circumstances to maintain secrecy are findings of fact that we review for clear error. *Electro-Craft*, 332 N.W.2d at 899, 902.

9

### a. *Generally known or readily ascertainable*

The district court acknowledged that some of the information in the customer-leads list was already possessed by MES through its Data.com subscription. The district court, however, found that Dexon's customer-leads list also included information that was not from Data.com. The question then is whether the information not included in the Data.com subscription was generally known or readily ascertainable.

We acknowledge that customer-lead lists are generally not trade secrets. *See Blackburn, Nickels & Smith, Inc. v. Erickson*, 366 N.W.2d 640, 645 (Minn. App. 1985) (holding that a customer list did not constitute a trade secret because "[i]t could be easily duplicated from public sources"), *review denied* (Minn. June 24, 1985). The information contained in customer-lead lists is often "'readily ascertainable by proper means' over the course of time without efforts beyond those ordinarily exerted by salesmen in developing customers." *Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985).

However, this case involves a very large amount of information—Durant's flash drive contained data on over 10,000 customers. In *Cherne*, our supreme court stated that "[t]he presence of an alternate means of obtaining the names of [10,000 potential customers] . . . without more, is not sufficient to establish that the information is generally ascertainable." 278 N.W.2d at 90. The district court concluded that Dexon's customer-leads list "included information that its employees acquired through their own networking and research" and "included relevant sales information specific to individual actual and potential customers." Because it could take MES significant time and effort to assemble a customer list containing the large amount of information contained on the

10

Dexon list, the district court's finding that the customer-leads list was not generally known or readily ascertainable is not clearly erroneous.

### b. Efforts that are reasonable under the circumstances to maintain secrecy.

MES argues that every case finding reasonable efforts to maintain the secrecy of customer-leads information involves a noncompete or confidentiality agreement identifying the information as confidential. *See, e.g.*, *Cherne*, 278 N.W.2d at 90 (noting reasonable efforts to maintain secrecy of customer-leads information where employees signed a covenant not to compete that prohibited them from disclosing or taking confidential information). Here, there was no noncompete or confidentiality agreement and no written confidentiality policy. But MES has not cited any decision specifically requiring the use of confidentiality agreements or explicit policies. This is because the statute does not require any specific actions. Instead, the test is whether the information "is the subject of efforts that are reasonable *under the circumstances* to maintain its secrecy." Minn. Stat. § 325C.01, subd. 5(i) (emphasis added).

MES maintains that the customer-leads list was "unprotected" and cites case law stating that reasonable efforts are not made when supposedly trade secret information is not "locked up." *Nordale, Inc. v. Samsco, Inc.*, 830 F. Supp. 1263, 1274 (D. Minn. 1993) (citing *Gordon Employment, Inc. v. Jewell*, 356 N.W.2d 738, 741 (Minn. App. 1984)). But the district court found that passwords were necessary to logon to Dexon computers and that keys were necessary to access Dexon's offices. Although Uzpen and Durant challenge the extent to which these policies were enforced, the district court's finding is

11

based on information in Dexon's verified complaint, and, on appeal, we must view the evidence in the light most favorable to the district court's order. *Toro Co.*, 519 N.W.2d at 914. Dexon protected the customer-leads list information by requiring passwords to access the computers on which the list was stored and by locking its offices. This is the twenty-first century equivalent of keeping the customer-leads list in a locked file and provides support for the district court's finding that Dexon took reasonable efforts to maintain the secrecy of the list.

Dexon never explicitly informed its employees that the customer-leads list information was confidential. This, however, does not negate the existence of a trade secret as long as, under the circumstances, the employee "knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained." Minn. Stat. § 325C.01, subd. 5. By only allowing employees to access a portion of the customer-leads list, requiring passwords to access its computer network, and locking its offices, Dexon indicated to employees that the information was confidential. Dexon's security measures were undoubtedly weakened by Dexon's instruction to employees to download the information onto flash drives, but its other actions did provide employees with a "reason to know" that Dexon intended the information to be confidential. Moreover, district court judges can apply common sense, as the court did here, finding that "Durant and Uzpen could not have reasonably believed they were permitted to take with them to their new employer a list of over 10,000 customers . . ., developed by Dexon."

We acknowledge that this was a close issue for the district court. But in reviewing a district court's findings, it is not our role to ascertain whether we would reach the same result. As the reviewing court, our task is only to assess whether the district court's finding is clearly erroneous. *See Electro-Craft Corp.*, 332 N.W.2d at 899, 902. We conclude that the district court did not clearly err in finding that Dexon made reasonable efforts to maintain the secrecy of the client-leads list, and it did not abuse its discretion by determining that Dexon is likely to succeed on its misappropriation-of-trade-secret claim.

## 2. *Tortious interference with prospective economic advantage*

To prevail on a claim of tortious interference with prospective economic advantage, a plaintiff must prove: (1) the existence of a reasonable expectation of economic advantage; (2) the defendant's knowledge of that expectation; (3) the defendant's intentional interference with the plaintiff's reasonable expectation of economic advantage in a manner that is tortious or in violation of a state or federal statute or regulation; (4) that without the defendant's interference, it is reasonably probable that plaintiff would have realized this economic advantage; and (5) that the plaintiff suffered damages. *Gieseke ex. rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). Dexon claims that, by soliciting its customers using the customer-leads list, MES interfered with Dexon's reasonable expectation of economic advantage. It claims that this interference was tortious because it involved the misappropriation of trade secrets and the conversion of Dexon's customer-leads list.

Given that the leads list was not generally known or readily ascertainable and contained information presumably helpful in making sales, Dexon likely did have a

13

reasonable expectation of economic advantage. By using the likely trade-secret customer-leads list, MES may have tortiuously interfered with that expectation. The district court's determination that Dexon is likely to succeed on this claim is not an abuse of discretion.[1]

Because Dexon is likely to succeed against MES on at least some of its claims,[2] the district court did not abuse its discretion by determining that the likelihood-of-success factor weighed in favor of granting the injunction.

## C. *Irreparable harm*

The party seeking a temporary restraining order must establish that the order is necessary to prevent irreparable harm and that there is no adequate legal remedy. *Cherne*, 278 N.W.2d at 92. MES argues that Dexon failed to meet this burden.

Irreparable harm may be inferred from the misappropriation of confidential or trade secret information. *Creative Commc'ns Consultants, Inc. v. Gaylord*, 403 N.W.2d 654, 657 (Minn. App. 1987). Dexon has established that MES likely misappropriated its trade secret customer-leads list. There is also evidence that Durant's use of the list has resulted in Dexon losing customers. Dexon has shown irreparable harm.

---

[1] The district court also concluded that MES is likely to succeed on its claim of unfair competition. Unfair competition is not an independent tort and does not have specific elements. *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305-06 (Minn. App. 1987). Instead, an unfair-competition claim can be based on successful claims of tortious interference with prospective economic advantage or misappropriation of trade secrets. *See United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632 (Minn. 1982). Accordingly, we need not separately address Dexon's likelihood of success on that claim.

[2] Dexon also brought a conversion claim against MES. The district court found that "[i]t is possible that Dexon may prevail on its conversion argument." Dexon concedes that the district court did not base the temporary restraining order on its likelihood of success on this claim. For this reason, we do not address it.

MES also argues that the legal remedy of damages would be adequate to compensate any harm suffered by Dexon. The district court's determination that a legal remedy would not be adequate is not an abuse of discretion. The list contains more than 10,000 actual and potential customers. It would be very difficult to determine after the fact whether Dexon lost those customers to MES as a result of MES obtaining the customer-leads list or for some other legitimate reason. Thus causation would be difficult to establish, and damages would be speculative.

### D. *The nature of the parties' relationship*

The nature and background of the parties' relationship is also one of the *Dahlberg* factors. *Dahlberg Bros., Inc.*, 272 Minn. at 274, 137 N.W.2d at 321. The purpose of a temporary restraining order is to maintain the status quo of the parties' relationship until a decision on the merits can be reached. *Foley*, 317 N.W.2d at 712.

MES argues that the restraining order does not maintain the status quo as of the date the district court issued the order, but rather reverts the matter back to the situation before Durant took the customer-leads information with him to MES. We disagree. The district court's order does not require MES to abandon any customers it has gained as a result of the use of the customer-leads list. It merely requires the company to refrain from using the confidential information going forward and to return the information to Dexon. This maintains the status quo by preserving fair competition between the parties.

The district court did not abuse its discretion by determining that this factor weighs in favor of granting the temporary restraining order.

### E. *Public-policy considerations*

The fourth *Dahlberg* factor requires the court to consider whether public-policy considerations as expressed in statute favor either party. 272 Minn. at 275, 137 N.W.2d at 321-22. The Uniform Trade Secrets Act expresses a desire to eliminate the misappropriation of trade secrets. *See* Minn. Stat. §§ 325C.01-.08. The district court did not abuse its discretion by concluding that this factor weighs in favor of an injunction.

### F. *Administrative burden*

The final *Dahlberg* factor is the administrative burden of judicial supervision and enforcement of the temporary restraining order. 272 Minn. at 275, 137 N.W.2d at 322. The district court determined that the administrative burden placed on the court weighed neither for nor against granting injunctive relief.

A report from a computer forensic expert indicated that deleting the information the district court termed confidential from MES's servers would take approximately 8-12 days. After the information is deleted, little to no additional oversight appears necessary. While the district court has had to issue one clarifying order, no hearing was held, and Dexon did not contest the clarification sought by MES.

The district court fashioned a common-sense injunction that appears easy to understand, implement, and maintain. The district court did not abuse its discretion by determining that this factor does not weigh against granting the order.

*G. Conclusion*

The district court considered the evidence presented by both parties and issued a thorough and thoughtful order discussing each *Dahlberg* factor in depth. The district court's temporary restraining order was not an abuse of discretion.

**Affirmed.**